JAMES R. DEASON, Guardian of the Estate of Pauline Crider, a Disabled Adult, Plaintiff-Appellant, v. SHERRY GUTZLER *et al.*, Defendants-Appellees.

Fifth District   No. 5—92—0542

Opinion filed November 12, 1993.

Law Office of Terry Sharp, P.C., of Mt. Vernon, for appellant.

No brief filed for appellees.

JUSTICE LEWIS delivered the opinion of the court:

Plaintiff, James R. Deason (James), as guardian of the estate of Pauline Crider, a disabled adult (Pauline), appeals the trial court's ruling that defendant, Sherry Gutzler (Sherry), has rebutted the presumption of fraud raised by James at a hearing on his complaint brought on behalf of Pauline. Sherry has not filed an answer brief, but because of the nature of the issues raised and the record provided, we can decide the issues without the benefit of an answer brief. (*First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 345 N.E.2d 493.) We reverse and remand for the reasons set forth below.

Before we address the merits of the appeal, we must first address plaintiff's motion to supplement the record, which we had ordered to be taken with the case. Plaintiff asks in his motion that we allow him to supplement the record with a copy of the power of attorney executed by Pauline. The power of attorney was not admitted into evidence at any of the hearings held before the trial court; however, considerable testimony about the power of attorney was presented. Supreme Court Rule 329 (134 Ill. 2d R. 329) provides that a record may be supplemented on appeal to supply omissions, to correct errors, and to settle any controversy about whether the record accurately reflects what occurred at trial. (*Nameoki Township v. Cruse* (1987), 155 Ill. App. 3d 889, 508 N.E.2d 1080.) However, this rule has been construed to allow supplementation of the record only with documents which were actually before the trial court. (*Nameoki Township*, 155 Ill. App. 3d 889, 508 N.E.2d 1080.) In this case, the power of attorney was not filed in the trial court; therefore, this document will not be considered on review. The plaintiff's motion to supplement the record on appeal is denied.

The facts necessary for our determination are as follows: James is a son of Pauline's from a previous marriage. On April 1, 1950, Pauline married Robert E. Crider (Robert), and they subsequently had a child, Sherry. Robert also had a son from a previous marriage, Robert W. Crider. In 1986 Pauline executed a power of attorney, naming Robert and Sherry as coagents for her. In 1987 and 1988, Robert, acting under his power of attorney from Pauline, closed out several bank accounts belonging to Pauline, on which he was not a joint tenant, and transferred the funds from those accounts to accounts in his and Sherry's names as joint tenants. On May 1, 1989, Sherry drafted a warranty deed for Robert and Pauline's marital home, which was held in joint tenancy. This warranty deed transferred the marital property to Robert and Sherry as joint tenants. Sherry had the new deed recorded that same day. On June 6, 1990, pursuant to two petitions for guardianship, one by James and one by Sherry, Pauline was adjudicated a disabled adult. James was made guardian of the estate, and James and Sherry were made coguardians of the person of Pauline.

James, as guardian of the estate, brought a citation proceeding to discover Pauline's assets, and hearings were conducted on the citation on October 9 and October 22, 1990. As a result of the citation proceedings, James filed the instant complaint, seeking to have the transactions done by Robert, under his power of attorney for Pauline, set aside as fraudulent and to have the assets which had been transferred out of Pauline's estate returned. A hearing on the complaint was held on July 23, 1991. At that hearing, James asked that the court take judicial notice of the transcripts of the former guardianship and citation proceedings, which the court agreed to do.

James testified at the guardianship hearing that he is 53 years of age and in good health. Although he has a doctorate in chemistry, he currently is employed as a tax preparer by H & R Block during tax season, and he also taught tax courses in the fall of the year. He resides in Wilmette, Illinois. Sherry is his half-sister and is the daughter of his mother and his stepfather, Robert. His grandmother's name was Ruby Britton (Ruby). Ruby was living with his mother and stepfather when she died in June 1988. Upon Ruby's death, Pauline inherited all of Ruby's estate, as Pauline was an only child. It was James' estimate that Ruby's estate, after the sale of Ruby's farm in Benton, Illinois, was worth approximately $50,000. James did not think that his stepfather paid any of his grandmother's bills, but that her bills were paid out of accounts held by him-

self and his mother as joint tenants. James did not know what happened to the money his mother inherited, but he did know that his mother tried to divide the money between himself and Sherry, as there were certificates of deposit (CDs) set up in his name, Pauline's name and Ruby's name; CDs in Sherry's name, Pauline's name, and Ruby's name; and CDs in Pauline's name and Ruby's name. He was unaware of where the CDs had gone. He did not inherit anything from his grandmother when she died.

According to James, his mother's illness (Alzheimer's disease) started as long ago as 10 years, and in the past four years she has gotten progressively worse. Sherry had told James that she and Robert had obtained a power of attorney over Pauline. It was James' opinion that Pauline needed to be in a nursing home, and he does not think that she will ever be able to leave the nursing home other than temporarily.

James stated that, before Pauline's illness, i.e., over four years ago, Robert's property consisted of the house owned by him and Pauline in joint tenancy and the furniture therein, one car, some tools, and a coin collection. After Pauline's illness, within the past four years, Robert bought three vehicles, a wide-screen television, and a satellite television system, and Robert also bought a satellite television system and a swimming pool for Sherry. Since Robert's death on April 19, 1990, Sherry had been driving one of the vehicles purchased by Robert, her brother Robert W., who lives in Florida, had been driving Robert's truck, and the third vehicle was sitting in the garage of the marital home in Mt. Vernon, Illinois.

James admitted that he has not been home often in the last few years. He stated he came home for Robert's funeral, and that he was home around Christmas time before that. He explained that he used to come home more often, but he was uncomfortable around Robert, as they did not get along in the last few years. James did not think that Robert was taking care of Pauline very well, and he objected to Robert's mental abuse of his mother (he yelled at Pauline). James also did not call very often in the last few years because Pauline was unable to carry on an intelligent conversation.

James stated that he did not think that Sherry should be guardian of Pauline's estate as he did not think she was fiscally responsible. He had no objection to Sherry being coguardian of Pauline's person, but he did not want her to be the sole guardian of her person as he was afraid that Sherry would take Pauline out of the nursing home. James admitted that it was he who placed Pauline in the nursing home.

Sherry testified at the various hearings that she is 37 years of age, that James is her half-brother, that she was close to her parents, and that her father Robert died on April 19, 1990. Pauline was diagnosed with Alzheimer's disease by her doctor, Dr. Hoffman, about three years ago. According to Sherry, Pauline has gotten progressively worse, and the disease is in its final stages now. At the beginning of Pauline's illness, she became forgetful and had no short-term memory; however, Sherry testified that in early 1988, Pauline's condition was good and she was able to participate in household decisions. The disease has now progressed to where her mother does not know anything or anybody, and her mental abilities are those of a one-year-old. Her mother had been at home until April 1990, and she and Robert had provided Pauline's care, but Pauline has been in a nursing home since that time. It was James' decision to place Pauline in the nursing home, and Sherry disagreed with this decision. Sherry testified that Robert hated the way James treated Pauline, because James did not call to see how Pauline was doing. Sherry admitted that her mother was unable to care for herself at the time of Robert's death and that Pauline was unable to attend Robert's funeral. According to Sherry, she has seen her parents daily for the past five years, and she had been on call constantly to help her father take care of Pauline.

In the last two months before Robert's death, Sherry was doing everything for both of her parents. Her father was not in good health during that time as he had been suffering many heart attacks. Sherry had discussed putting Pauline in a nursing home with Robert in March 1990, as Pauline's doctor, Dr. Hoffman, said that Pauline was going to become hard to handle and that they could not continue as they had been doing. Sherry had investigated getting Pauline on welfare and placing her in a nursing home. She had been advised that the only requirement to be met to get Pauline on Medicaid was that Pauline have prepaid burial arrangements.

Sherry testified that Robert obtained a power of attorney over Ruby at the same time that he obtained his power of attorney over Pauline. Sherry admitted she was named as a coagent on the power of attorney executed by Pauline. Ruby's social security checks were mailed to her parents' home, and these checks were used by Robert to take care of her. Sherry stated that her grandmother, Ruby, lived with her parents from November 1987 until her death in June 1988. Before coming to stay with her parents, Ruby had been in a nursing home for about six months. Ruby was brought to her parents' home by Robert, as he decided that he could take care of Ruby.

Robert told Sherry that Ruby's funds were getting low, and that it had cost about $30,000 to keep Ruby in the nursing home. Ruby was not ill, but she was 96 years old. Sherry did not know what had become of her grandmother's money.

Sherry testified that she was divorced in 1985, and that she has two sons, aged 10 and 12. After her divorce, she was on public aid. Pauline bought Sherry a new car when she got divorced. Then, in 1988, her parents bought her another new car. Robert bought Sherry a satellite dish in 1987 and had bought her a swimming pool in 1985.

Sherry admitted that in 1989, Robert gave her the deed to his and Pauline's marital home. Robert asked her to transfer that property into his and Sherry's name as joint tenants. Sherry had worked as a legal secretary so she filled out the warranty deed. Robert signed the deed both as an individual in his own right and in Pauline's name under his power of attorney. Sherry had the deed recorded on May 1, 1989. Sherry stated that when Robert gave her the deed and requested the transfer of ownership, he said he wanted her to have the home and to use it to help provide for her mother. Sherry said that both Pauline and Robert wanted her to have the house, and that her mother had said so.

When Robert died in April 1990, he did not leave a will. At the time of Robert's death, there were three vehicles in his name alone. Sherry knew that her father had bought the 1988 Mercury Cougar in December 1987 for $18,000 cash. Then, in March 1988, Robert bought a 1988 Plymouth Voyager for $17,000, for which he wrote a check. (The evidence presented showed that the original source of the $17,000 was an account of Pauline's that had been transferred to Robert's and Sherry's names in January 1988 but was closed by Robert in March 1988, at which time the $17,000 check was written.) Sherry testified that both of these vehicles were for her, even though they were titled in her father's name, and that her father gave her $36,000 worth of cars in six months' time. Sherry said her mother knew that Robert had bought the vehicles as she was with them when the vehicles were purchased. Sherry used the vehicles to take her parents shopping and to run errands for them. Her mother was unable to drive at that time. Robert bought the 1989 GMC truck as he wanted something to leave to his son in Florida; however, half of the truck's cost was financed, and her stepbrother assumed the rest of the payments, about $100 per month.

After Robert's death, Sherry and her stepbrother Robert went to the Secretary of State's office and had the titles of these vehi-

cles transferred to her and her stepbrother, two of them to her and one to her stepbrother. In order to transfer title on the vehicles, she and her stepbrother had to sign an affidavit. On the affidavit, Pauline was not listed as Robert's surviving spouse. Sherry explained that she did not intentionally omit Pauline's name, as the document was prepared by a person named Michelle. Michelle was a friend of the family and was aware of Pauline's illness. Sherry and her brother Robert signed the affidavit without reading it.

Robert also had four CDs in Sherry's name and his name at the time of his death. Sherry was aware that Robert had transferred the CDs to his and her names, as Robert had told her about the transfers and she had to sign a signature card for the first one. When Robert was in the hospital before his death, he told her where the CDs were. Robert told her to cash the CDs out and to use them to help take care of Pauline. He told her not to let anyone take the CDs from her.

On April 25, 1990, Sherry cashed in all of the CDs, a total of $42,953.32. When she cashed the CDs, she sent $4,000 of the money to her stepbrother in Florida. She also used approximately $11,000 to pay off her credit cards. She paid about $1,500 to Dr. Hoffman for medical bills for Pauline and Robert. She also took a vacation to Florida, which cost her about $5,000. According to Sherry, she paid about $5,000 for expenses on her parents' marital home. Sherry testified that Pauline does not have any prepaid burial plan, and that her father's funeral expenses of $7,000 were still unpaid. At the guardianship proceeding, Sherry testified that she had approximately $30,000 remaining from the CDs she had cashed at home. However, Sherry testified at the citation proceeding, about four months later, that she only had about $700 or $800 left of the funds from the CDs. When asked what happened to the $29,000 she had had earlier, she said: "Just spent it. Cost of living." Sherry also admitted that, after her father's death, she removed the 46-inch Zenith television from her parents' home. At the time of Robert's death, Sherry said she was still on public aid.

At the guardianship hearing, Sherry had three witnesses testify on her behalf. These three witnesses basically corroborated that Sherry helped to take care of her parents and that she was at their home often.

Nancy Sodders, a vice-president of King City Federal Savings Bank (King City), testified that Pauline had been a bank customer of King City for many years. Nancy traced the source of numerous funds transferred from accounts owned by Pauline which were ulti-

mately transferred to Robert's and Sherry's names as joint tenants. Of the accounts transferred by Robert under his power of attorney, only one or two of the accounts transferred had been held originally in joint tenancy with Robert or Sherry.

The foregoing was the information before the court at the time of the hearing on the complaint filed by James for fraud against Sherry, Robert's estate, and Robert's son in Florida. The court stated at the hearing that James had presented sufficient evidence to raise the presumption of fraud as to the transactions regarding the real estate and the CDs transferred by Robert pursuant to his power of attorney. By implication, the presumption also applied to Sherry since she was a coagent on the power of attorney. However, in a docket order entered by the court on December 16, 1991, the court simply stated, "The court having heard the testimony & having considered the argument of counsel, relevant cases & previous transcripts filed in cause 90—P—39 [guardianship and citation proceedings] finds that def. Sherry Gutzler has overcome any presumption of fraudulent transactions in her dealing with her mother's property & therefore Judgment is entered in favor of defendant." No further statement or explanation of the court's holding was provided. James filed a motion to reconsider this ruling, but the court denied his motion. This appeal followed.

■ There is no issue raised in this appeal that James did not raise the presumption that the transactions performed by Robert with his power of attorney for Pauline were fraudulent. The law regarding this matter is that a power of attorney gives rise to a general fiduciary relationship between the principal and the agent, and if it is shown that the agent has entered into a transaction between the agent and the principal which benefits the agent, the transaction is presumptively fraudulent. (*Pottinger v. Pottinger* (1992), 238 Ill. App. 3d 908, 605 N.E.2d 1130; *White v. Raines* (1991), 215 Ill. App. 3d 49, 574 N.E.2d 272.) A power of attorney creates a fiduciary relationship as a matter of law. (*Lemp v. Hauptmann* (1988), 170 Ill. App. 3d 753, 525 N.E.2d 203.) Once the presumption of fraud is established, the burden shifts to the agent to show by clear and convincing evidence that the transaction was fair and equitable and did not result from undue influence. (*White v. Raines* (1991), 215 Ill. App. 3d 49, 574 N.E.2d 272.) Here, the court stated on the record that the presumption arose in the case *sub judice*, and in the court's docket order, it states only that the presumption was rebutted, leading to the inference that the presumption had been raised.

Therefore, the burden to show that the transactions were fair and did not result from undue influence shifted to Sherry.

To rebut the presumption, a fiduciary must establish that the transfer was a gift. (*White v. Raines* (1991), 215 Ill. App. 3d 49, 574 N.E.2d 272.) Where there is a fiduciary relationship, a gift is not presumed, regardless of the relationship of the parties involved. See *Lemp v. Hauptmann* (1988), 170 Ill. App. 3d 753, 525 N.E.2d 203.

At trial, Sherry appears to argue that the transactions done under the power of attorney were permissible either because of the marital relationship of Robert and Pauline and because they were impliedly intended as a gift to the marriage, or because the transfers were an outright gift to Robert and Sherry. Initially, we note that in the recent case of *In re Estate of Glogovsek* (1993), 248 Ill. App. 3d 784, decided by this court, we declined to find that there was undue influence simply because of a spousal relationship; however, we did not rule out the possibility that the presumption of undue influence could exist in such a relationship. Here, the marital relationship did not preclude a presumption of fraud and of undue influence, which must be rebutted by clear and convincing evidence since there was a power of attorney. The power of attorney granted herein gave Robert access to Pauline's accounts on which he was not named as a co-owner and to which he otherwise would not have had access under the marital relationship unless Pauline had made a gift to him (since the funds were inherited by Pauline and were not marital property). Thus, the fact that Robert was Pauline's husband does not defeat the presumption of undue influence. Additionally, a presumption of gift does not arise in a parent-child relationship where a fiduciary relationship exists, but the claim that a transaction was a gift still must be proved by clear and convincing evidence. *Lemp v. Hauptmann* (1988), 170 Ill. App. 3d 753, 525 N.E.2d 203.

The next question to be addressed is whether the evidence presented negated the presumption under the theory that the transactions were a gift to Robert and Sherry. The evidence revealed that Robert transferred the marital property to Sherry and himself in joint tenancy. While he still retained his portion of the marital property by this transaction, the transfer did nothing to benefit Pauline. There was no evidence, other than Sherry's self-serving testimony, that Pauline ever intended to make Sherry a gift of her share of the marital property.

Similarly, Robert transferred monies in CDs from accounts in which he had no interest to accounts wherein he and Sherry had exclusive rights. Again, there is no evidence that Pauline intended to bestow a gift on Robert and on Sherry, other than Sherry's self-serving statements. Thus, Sherry presented insufficient evidence, in fact none whatsoever, to prove that Pauline intended the transactions done under the power of attorney to be a gift to Robert and her.

Moreover, Pauline received very little benefit from these transactions. The power of attorney stated that her agents were to handle her financial matters for her benefit, and the testimony of Sherry revealed that the money and the marital home were to be held and used to take care of Pauline. However, the evidence established that Sherry used the funds obtained from the transactions primarily to benefit herself. Thus, we find that the court's determination that Sherry successfully rebutted the presumption of fraud by clear and convincing evidence to be against the manifest weight of the evidence. (*White v. Raines* (1991), 215 Ill. App. 3d 49, 574 N.E.2d 272.) Therefore, the transfer of the marital home to Robert and Sherry must be set aside, and the joint tenancy between Pauline and Robert must be reasserted. From the evidence presented at the hearings, Pauline would now be the sole owner of the marital property under rights of survivorship of the joint tenancy, and the property should be restored to Pauline's estate. In addition, the transactions involving the bank accounts transferred to Robert and Sherry under the power of attorney must be invalidated and set aside. An order should be entered giving a judgment in favor of Pauline's estate and against Sherry for the money transferred. Because the record is not absolutely clear as to the amount of the money actually transferred, this cause is remanded for a determination of the amount of damages owed to Pauline's estate by Sherry in accordance with this opinion.

For the foregoing reasons, plaintiff's motion to supplement the record is denied, the court's judgment is reversed, and this matter is remanded for proceedings in accordance with this opinion.

Motion denied; reversed and remanded with directions.

WELCH and GOLDENHERSH, JJ., concur.