*In re* ESTATE OF ROSE S. DeJARNETTE, Deceased (Dorothy Meis *et al.*, Petitioners-Appellants, v. Vera Lecouris, Respondent-Appellee (Donald A. Behle, Special Adm'r of the Estate of Rose S. DeJarnette, Deceased, Petitioner)).

Fourth District    No. 4—96—0649

Argued February 18, 1997.—Opinion filed March 24, 1997.

A.J. Rudasill (argued), of Rudasill & Spence, of Clinton, for appellants.

Stephen L. Miller (argued), of Miller & Miller, of Lincoln, for appellee.

JUSTICE COOK delivered the opinion of the court:

Rose DeJarnette gave her power of attorney to her cousin, Vera Lecouris. Thereafter, Vera arranged for Rose's funds to be placed in joint tenancy accounts with Vera and for Vera to be named beneficiary of a life insurance policy and a pension fund. In this citation proceeding, the trial court ordered Vera to reimburse Rose's estate for various amounts Vera claimed were *inter vivos* gifts but allowed Vera to keep the joint accounts and other assets. Rose's legatees appeal. We reverse and remand in part and dismiss the appeal in part.

## I

Rose was born in 1907 and died June 19, 1993. From 1977 until

the time of her death, she resided at Walnut Ridge Nursing Home (Walnut Ridge). In 1979, Rose gave her cousin, Hester Huff, power of attorney over her affairs. When Hester's health began to fail, in 1988, Rose executed another power of attorney, in which Vera was also named. Vera became sole attorney-in-fact upon Hester's death in August 1990.

Rose did some estate planning after her husband's death in November 1971. In late 1971, she executed a form making Hester the beneficiary of her life insurance policy with Equitable Life Insurance. In 1972, she made Hester the designated recipient of the death benefit of her pension with Teachers' Retirement System (TRS). In Rose's 1972 last will and testament, she devised Hester her grandmother's watch, a life estate in one-half of her real property (the remainder to go to Hester's "bodily lineal descendants") and one-quarter of her residuary estate. Lyle Stoll, another cousin of Rose's, was devised a life estate in the other one-half of the real property (the remainder to Hester's bodily lineal descendants) and also was to receive one-quarter of the residuary estate. The remaining one-half of the residue was to be split equally among 28 named persons, Vera among them.

Rose did not change her estate plan after Lyle died in 1986. After Hester's death, Rose's savings account and checking account at the State Bank of Lincoln (Lincoln) were changed in September 1990 to joint tenancy with Vera. Rose's signature appears on signature cards authorizing these changes. Vera testified she filled out the cards and brought them to Rose at Walnut Ridge, Rose signed them, and Vera returned them to the bank.

Rose also signed a Bank of Chestnut (Chestnut) signature card in September 1990, which Vera had obtained, filled out, brought to Rose for her signature, and returned to the bank. That document, which states on its face that it "goes with your time certificate of deposit [(CD)][N]o. 1554," directs that the account be made joint between Rose and Vera. However, Rose did not have a CD No. 1554 at Chestnut. William Glaze, a loan officer at Chestnut, testified that 1554 was Rose's customer number, and the document had the effect of changing all of Rose's CDs at the Chestnut to joint tenancy with Vera.

In October 1990, joint checking account No. 121-045 was opened at Chestnut. Rose's and Vera's signatures appear on the signature card. Again, Vera testified she filled out the card, brought it to Rose at Walnut Ridge for her signature, and took it to the bank. That account was funded with $12,555.03 Vera obtained by using the power of attorney to cash some United States Treasury E bonds (E bonds)

held in Rose's name alone. Vera testified she did that because Hester had allowed Rose's Medicare supplemental insurance to lapse, and Vera felt it was important to have cash on hand in the event of an emergency. On October 9, the day after the account was opened, Vera wrote herself a check on the account in the amount of $2,555.03, with the notation, "1989 Business." On the same date, she wrote herself a check for $2,500 from the Lincoln joint checking account, with the notation, "1990 Business Gift." Vera testified these two transfers were at Rose's direction. They were part of the funds the trial court ordered Vera to reimburse the estate.

In October 1990, TRS wrote Vera indicating it could not accept a form she had sent in nominating herself as beneficiary of Rose's TRS pension. In November, Rose signed a form, filled out by Vera, making Vera the beneficiary of Rose's TRS pension. In December 1990, Rose signed a form, which Vera had filled out, making Vera the beneficiary of Rose's life insurance.

On August 15, 1991, Norman Huff, Hester's son and one of the petitioners, went with Vera to visit Rose. He spent between 2 and $2^1/2$ hours with her. He testified that Rose recognized him, knew who he was, and seemed clearheaded and able to communicate effectively. Norman wrote a letter in March 1994 to counsel for Vera regarding the visit, and that letter was introduced into evidence. The letter contained the following paragraph:

"I told Rose that we had found Mother's [(Hester's)] copy of Rose's will in the file cabinet and when I read it I noticed that Vera may have been left out. I wasn't sure! She informed me very abruptly that if there was anything left when she passed away, Hester's kids would get her farm land, and her joint accounts would go to Vera, so I did not mention it again!"

Norman repudiated this paragraph when he testified. He reaffirmed that Rose seemed competent but maintained this particular section was not true, that there had in fact been no conversation regarding Rose's will or joint accounts. He said the paragraph was not in his first draft of the letter, but when he showed the letter to Vera (before he sent it to Vera's counsel), Vera said it would not be much help. Vera told him that her counsel had hoped there would be some mention of joint accounts. Norman told Vera he could rewrite it, and he did. He said he did so because he did not think there could be very much money involved, and he hoped the letter would end the litigation, which he saw as a waste of time. Vera testified that she did not tell Norman to mention joint accounts when he showed her the first draft of the letter, that she merely asked him to " '[b]e specific.' " She did admit he showed her the letter and redrafted it at her home before he sent it to her counsel.

Vera testified that on January 24, 1992, she and Rose had a conversation in which Rose asked if Vera had been in Hester's will. When Vera said she had not been, Rose said she could " 'take care of that. Would you, whatever it takes, I want to change the [CDs] into your name, both at Chestnut and at [Lincoln].' " On January 28, Rose signed the following document:

"I Rose W. DeJarnette direct [Chestnut] to add Vera R. Lecouris on my [CDs] whose numbers are 23969, 23241, 25062, and 25063. This same directive is to be followed in the event of purchase of additional [CDs] in my name or to changes in any of the [aforementioned] [CD] amounts which would make it necessary to rewrite the [CD]."

Rose's signature on the document was notarized. Glaze testified the document had no effect as far as Chestnut was concerned, since all the CDs there were already in joint tenancy because of the card Rose had signed in September 1990. By the end of January 1992, Vera had changed all the certificates for the CDs, at both banks, so that on their faces they showed both Vera and Rose as owners.

In February 1992, Vera opened a joint mutual fund account with Prudential Mutual Fund Services (Prudential). Rose did not sign the application; Vera signed it for her using the power of attorney. Vera opened the account with $30,000, $10,000 of which came from one of the Lincoln CDs, $8,000 from the account opened with the proceeds from the E bonds, and $12,000 from the Lincoln savings account. To this initial deposit were added $20,000 in June 1992, $10,000 in July 1992, and $32,436.26 in August 1992. Forty thousand dollars came from the remaining CDs at Lincoln, and the other $22,436.26 came from CDs at Chestnut. Vera testified she signed each of the CDs. Only four of those signatures (on four Lincoln CDs) are in the record. Two of them Vera signed "Vera Lecouris P.O.A.," while on the other two Vera signed Rose's name and then signed "Vera R. Lecouris P.O.A." beneath. In September 1992, another Chestnut CD came due, which Vera testified she endorsed and deposited into her personal account according to Rose's direction.

There was some testimony regarding Rose's mental condition during the times these transfers were made. The only doctor who testified, Dr. Daniel O'Brien, was unable to state an opinion as to Rose's competence. He read quite extensively from the notes of Rose's previous physician, Dr. Newell, but the trial court sustained a hearsay objection to the notes, only allowing them in to explain Dr. O'Brien's expert opinion (of which there was none). *Wilson v. Clark*, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981); see *Kelly v. HCI Heinz Construction Co.*, 282 Ill. App. 3d 36, 42, 668 N.E.2d 596, 600 (1996)

(trial court has discretion to refuse admission of medical records, offered as business records, despite 1992 amendment to Supreme Court Rule 236 (145 Ill. 2d R. 236)). Vera's hearsay objection to another document, in which Dr. Newell had stated that Rose was unable to comprehend the rights and responsibilities of a nursing home resident, was also sustained. Doris Wilson, Rose's nurse during the relevant period, testified Rose was able to function so long as she was able to follow her routine, but she would go into a "tizzy" if the routine were not followed. Wilson testified Rose was very suggestible, that she "didn't have the mentality of an adult," and "[i]f Rose was used to seeing you you could tell her what to do."

## II

The trial court first noted that an attorney-in-fact is charged with a fiduciary obligation to act in his principal's best interests, and that an attorney-in-fact has no authority to make donations or engage in self-dealing. The trial court accordingly voided the lifetime transfers totalling $13,173.19. On the post-trial motion, the court ruled that the lifetime transfers were violative of Vera's fiduciary responsibility—"they were an example of poor judgment on her part but not to the extent the transfers amounted to fraud."

The trial court referred to "the balancing test as suggested in *Murgic [v. Granite City Trust & Savings Bank*, 31 Ill. 2d 587, 202 N.E.2d 470 (1964),]* where conflicting presumptions are involved." The conflicting "presumptions" in *Murgic* were that (1) one claiming a gift must prove donative intent by clear and convincing evidence, but (2) creation of a joint tenancy account gives rise to a presumption of donative intent. *Murgic* held the presumption of donative intent controlled, the person claiming against the surviving joint tenant had the burden of disproving intent, and to void the presumption of donative intent the proof was required to be clear and convincing. *Murgic*, 31 Ill. 2d at 590-91, 202 N.E.2d at 472. The trial court found there was no clear and convincing evidence of undue influence or that Rose was incompetent. It seems clear the trial court saw this case as resolved by *Murgic* and determined that the controlling presumption of donative intent arising from the creation of the joint tenancies had not been refuted by clear and convincing evidence.

The trial court did discuss the presumption of fraud, stating that Vera's inexperience and poor judgment had not "been clearly and convincingly shown to amount to fraud." That analysis is backwards but, in its ruling on the post-trial motion, the court revised its statement to say that "there is sufficient evidence to rebut any presumption of fraud." Apparently, that evidence is the court's finding that

Vera had Rose's welfare in mind above all others and that Rose's plan was to take care of those who took care of her. The trial court stated that it had ample opportunity to observe the witnesses, particularly Vera.

## III

■ There is a presumption of donative intent where the proof shows that the making of a deposit and the execution of the joint tenancy account contract are in conformity with the statute. *Murgic*, 31 Ill. 2d at 590, 202 N.E.2d at 472. " 'Public policy would seem to require the adoption by the courts' of a more liberal and practical view of these common transactions.' " *Murgic*, 31 Ill. 2d at 590, 202 N.E.2d at 472, quoting *Frey v. Wubbena*, 26 Ill. 2d 62, 66, 185 N.E.2d 850, 853 (1962). In order to go behind the terms of the joint account agreement, the one claiming adversely thereto has the burden of establishing by clear and convincing evidence that a gift was not intended. This burden does not shift to the party claiming under the agreement. *Murgic*, 31 Ill. 2d at 591, 202 N.E.2d at 472.

■ However, there is a presumption of fraud or undue influence where there is a fiduciary relationship between the parties and the fiduciary has benefitted by virtue of his fiduciary status. The burden of proof is on the fiduciary to rebut the presumption by clear and convincing proof that he has exercised good faith and has not betrayed the confidence reposed in him. Significant factors in meeting that burden include a showing that the fiduciary made a frank disclosure of the information he had, he paid adequate consideration, and the principal had competent and independent advice. *Rizzo v. Rizzo*, 3 Ill. 2d 291, 304-05, 120 N.E.2d 546, 553 (1954); see *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 464, 448 N.E.2d 872, 877-78 (1983). Where a fiduciary relationship is alleged simply on the basis of evidence showing trust and confidence have been reposed by one person in another, the existence of the relationship must be proved by clear and convincing evidence; one who holds a power of attorney, however, is a fiduciary as a matter of law. *Pottinger v. Pottinger*, 238 Ill. App. 3d 908, 917, 605 N.E.2d 1130, 1137-38 (1992).

■ The trial court here cited *Anthony v. Anthony*, 20 Ill. 2d 584, 587, 170 N.E.2d 603, 604 (1960), for the proposition that a presumption of undue influence will not arise from the mere fact of a fiduciary relationship but requires a showing of "participation in procuring execution of the will." The execution of a will provides more protections, however, than do *inter vivos* transfers arranged by the fiduciary, including transfers that utilize joint tenancy accounts. The court was concerned in *Anthony* that it might be impossible for an

elderly parent to leave his property to a child who took care of him if a presumption of undue influence arose from the mere fact of a confidential or fiduciary relationship. Nevertheless, there are cases that do hold the fact that a fiduciary relationship exists is not sufficient to rebut the presumption of donative intent inherent in joint tenancy accounts, absent evidence the fiduciary relationship was abused. See *In re Estate of Foster*, 104 Ill. App. 2d 447, 453-54, 244 N.E.2d 620, 623-24 (1969); *In re Estate of Copp*, 132 Ill. App. 2d 974, 980, 271 N.E.2d 1, 5 (1971); *In re Estate of Wilkening*, 109 Ill. App. 3d 934, 939-40, 441 N.E.2d 158, 162 (1982); *cf. Lemp v. Hauptmann*, 170 Ill. App. 3d 753, 758, 525 N.E.2d 203, 206 (1988) (fiduciary relationship defeats presumption of gift from parent to child). None of these cases involved a written power of attorney other than *Lemp*, which did not involve a joint account, but they did involve actions on behalf of another similar to actions typically taken by an attorney-in-fact.

■ This court has refused to follow *Foster*, *Copp*, and *Wilkening* and has held that where there were conflicting presumptions arising from the creation of a joint tenancy and the existence of a fiduciary relationship, the presumptions canceled each other, and the trial court was required to decide the case on the evidence before it of donative intent and undue influence. *In re Estate of Harms*, 236 Ill. App. 3d 630, 639-40, 603 N.E.2d 37, 44 (1992). We recently limited *Harms* to apply only where the joint tenancy accounts were created prior to the fiduciary relationship and where deposits made during the fiduciary relationship followed a procedure established prior to the relationship. *In re Estate of Rybolt*, 258 Ill. App. 3d 886, 890, 631 N.E.2d 792, 795 (1994). Certainly, where the attorney-in-fact actively uses his position to create the joint tenancies the presumptions do not cancel; instead, the controlling presumption is the presumption of fraud, which requires strong evidence to overcome. *Rybolt*, 258 Ill. App. 3d at 890, 631 N.E.2d at 795.

There is no presumption of donative intent unless it is shown that "the making of the deposit and the execution of the contract is in conformity with the statute." *Murgic*, 31 Ill. 2d at 590, 202 N.E.2d at 472. The "statute" is section 2(a) of "An Act to revise the law in relation to joint rights and obligations." Ill. Rev. Stat. 1989, ch. 76, par. 2(a). Other statutes apply to statutory survivorship accounts in savings and loan institutions, and to safe deposit boxes. See *Harms*, 236 Ill. App. 3d at 637, 603 N.E.2d at 42-43. The parties have not suggested whether a statute applies to a joint mutual fund account with an insurance company. The life insurance policy and the teacher's pension do not involve joint tenancy accounts at all, and accordingly there is no presumption of donative intent with those holdings.

## IV

It is undisputed that Rose gave Vera her power of attorney and that Vera benefitted by virtue of that relationship. The question in this case accordingly is whether Vera has met her burden of rebutting the presumption of fraud by clear and convincing evidence. The trial court stated that Vera had met her burden, that the court "has had the opportunity to watch Vera testify for hours and to weigh and evaluate her answers and credibility." The resolution of these cases, however, should not turn upon how good a witness the alleged donee happens to be. The legislature enacted the Dead-Man's Act (now 735 ILCS 5/8—201 (West 1994)) because of its recognition the survivor to a transaction has a temptation to testify falsely. *Hoem v. Zia*, 159 Ill. 2d 193, 201, 636 N.E.2d 479, 483 (1994). The parties have not indicated how Vera's testimony was affected by the Dead-Man's Act. Even where there is no Dead-Man's Act problem, the testimony of a donee as to what was said to him by a deceased donor should be carefully scrutinized. *Hofferkamp v. Brehm*, 273 Ill. App. 3d 263, 274, 652 N.E.2d 1381, 1389 (1995). One of the *Rizzo* factors is whether the principal had competent and independent advice. *Rizzo*, 3 Ill. 2d at 304-05, 120 N.E.2d at 553. Along those lines, the court in *Rybolt*, although generally relying on the presumption of fraud, found donative intent as to a $20,000 CD at the First National Bank of Decatur "based upon testimony of the bank employees." *Rybolt*, 258 Ill. App. 3d at 890, 631 N.E.2d at 795.

■ Applying the *Rizzo* factors, Vera has clearly not met her burden. Vera filled out the signature cards for the various accounts and was the only one present when Rose signed them, although Vera later prepared a document regarding the Chestnut accounts that Rose signed before a notary public. Vera prepared the forms regarding the TRS pension and the life insurance and was the only one present when they were signed. The joint mutual fund with Prudential did not involve Rose's signature at all; Vera opened it using her power of attorney. Rose did not have an established practice of using joint tenancy accounts before she gave Vera her power of attorney. During the last years of life, Rose went from having no assets in joint tenancy to having all her personal property in joint tenancy with Vera. Perhaps it was Rose's plan to take care of those who took care of her, but that does not explain why Vera was entitled to almost nothing immediately before Hester's death and almost everything very quickly thereafter. Hester and her family were apparently natural objects of Rose's bounty even before Hester was given power of attorney in 1979. Was not Hester entitled to something for her work between 1979 and 1988? Most of Rose's physical needs were met by

the nursing home. The only independent evidence regarding Rose's competency was that she was easily led.

The trial court noted it might have been wiser if disinterested third persons had been involved, but that ideal did not comport with how such matters were actually handled in practice. We reject that analysis. Once the presumption of fraud is established, the burden shifts to the fiduciary to show by clear and convincing evidence that the transaction was fair and equitable and did not result from undue influence. *Deason v. Gutzler*, 251 Ill. App. 3d 630, 637, 622 N.E.2d 1276, 1281-82 (1993). Vera did not do so here.

V

■ Petitioners argue sanctions should be imposed on Vera. The trial court did rule against Vera to the extent of the *inter vivos* transfers. However, the trial court never ruled on the motion for sanctions. The issue is not properly before us. See *Almgren v. Rush-Presbyterian-St. Luke's Medical Center*, 162 Ill. 2d 205, 210, 642 N.E.2d 1264, 1266 (1994). That portion of the appeal is dismissed.

For the reasons above stated, we reverse the ruling appealed from and remand for the entry of an order in accordance with the views set out herein. We dismiss that portion of the appeal relating to sanctions against Vera.

Reversed and remanded in part; dismissed in part.

STEIGMANN, P.J., and McCULLOUGH, J., concur.