# Illinois Official Reports

## Appellate Court

*In re Estate of Gerulis*, 2020 IL App (3d) 180734

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF EUGENIUS GERULIS, Deceased (Laima Puzzo and Andrius Gerulis, Petitioners-Appellees, v. Rimas Gerulis and Rita Gerulis, Respondents-Appellants). |
| District & No. | Third District No. 3-18-0734 |
| Filed Rehearing denied | March 5, 2020 June 9, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 10-P-596; the Hon. Jeffrey Allen, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. Cause remanded with directions. |
| Counsel on Appeal | James A. Murphy and Marron A. Mahoney, of Mahoney, Silverman & Cross, LLC, of Joliet, for appellants. Daniel F. Marren, of Peter J. Latz & Associates, LLC, of Oak Park, and A. Michael Wojtak, of Tracy Johnson & Wilson, of Joliet, for appellees. |

Panel                    JUSTICE McDADE delivered the judgment of the court, with opinion.
                         Justices Carter and O'Brien concurred in the judgment and opinion.


**OPINION**

¶ 1        Rimas Gerulis became attorney-in-fact for his father, Eugenius Gerulis (Eugenius), when Eugenius's wife died. Thereafter, Eugenius returned to Illinois and moved in with Rimas, who arranged over the next several years for Eugenius's funds to be placed in joint accounts with him. Rimas also introduced Eugenius to an attorney who assisted Eugenius in executing a new will substantially benefitting Rimas to the detriment of Eugenius's two other children (petitioners). The propriety and consequences of those actions were and are in dispute. The trial court ordered Rimas and his wife Rita (respondents), to reimburse Eugenius's estate for various amounts of claimed "*inter vivos*" gifts and to set aside Eugenius's new will. The trial court also ordered respondents to pay $290,690.63 in prejudgment interest to Eugenius's estate. Respondents appeal. We affirm in part, reverse in part, and remand with directions.


¶ 2                               I. BACKGROUND

¶ 3        Eugenius was originally from Lithuania. He immigrated to the United States sometime around 1951. He and his wife Vale lived in Illinois. They had three children: (1) Laima Puzzo, (2) Rimas Gerulis, and (3) Andrius Gerulis. Laima is the eldest, and Andrius is the youngest. Rimas is the eldest son.

¶ 4        Eugenius worked as an electrical engineer draftsman for the City of Chicago. In 1985, he retired and moved to Florida with Vale. In 2000, they executed wills and a joint trust agreement. They also executed two mutual durable powers of attorney for property and for living wills. Each gave the powers of attorney to the other, with Rimas as successor. In 2001, Vale died, and Eugenius remained in Florida. But in 2004, Eugenius fell and fractured his back. As a result, he moved in with respondents in Wheaton, Illinois. Eugenius died on December 28, 2009, at the age of 87.


¶ 5                       A. Eugenius's Health and Competency

¶ 6        Before moving to Florida, Eugenius earned a doctorate in Divinity, for which he wrote a dissertation on prayers. He became the editor of his church newspaper. After his return from Florida, Eugenius resumed writing articles for his church paper. He would write on the crisis in the church, the reforms he believed were needed, and other religious matters, as well as on correcting historical inaccuracies.

¶ 7        Reverend deacon Ericka Brooks had known Eugenius and Vale since 1951. She testified that through mid-2009, Eugenius was mentally one of the strongest people she had known for his age. She explained that they would discuss world events. She testified that when he returned to Illinois, Eugenius began giving sermons and leading services at their church. She described the sermons as being of "high intellectual level." She also stated that he donated money to the church between 2004 and 2009. She believed he was competent to do so.

¶ 8        Dr. Pranus Jurkas testified that he met Eugenius at the Baltic University back in 1947, and they have since remained friends. When Jurkas's wife died in the summer of 2006, he asked

Eugenius to officiate the funeral. He believed that Eugenius was fully competent during the ceremony, with a good memory and no "trace of deterioration in [his] mental capacity." He testified that Eugenius "had his full mind and his brain was working excellent."

¶ 9 Eugenius changed his trust and will in June 2006. Also, in 2006, he sold a car to his daughter, Laima. She had no doubt that he was competent to decide to sell his car to her. She believed that Eugenius "was a quirky man," socially awkward, and with difficulties relating to people. She had not asked Eugenius to move in with her, believing it would not be the best arrangement for Eugenius because her house was small and her family members did not speak Lithuanian. She stated that Eugenius did not feel comfortable speaking English. During her conversations with Eugenius between 2004 and 2009, Laima never thought that he was confused.

¶ 10 Similarly, Geidrius Siautias, a relative of Eugenius, testified that from 2004 through 2009, Eugenius was "mentally sharp." Steven Hajek, a handyman who befriended Eugenius, testified that they spoke on a weekly basis during the same time period. He recalled that Eugenius never seemed confused and was "very competent and sharp."

¶ 11 Dr. Gaile Sabaliauskas, a cardiology specialist, regularly examined Eugenius at least every six months between January 2006 and April 2009. She found him always "mentally alert and oriented to time, place, and person and understanding of what was going on around him." She found that Eugenius "always seemed as though he understood what was going on." She stated that "he never appeared confused." She explained that her conclusions were from regularly conducted neuro-psych examinations.

¶ 12 During the time he lived with respondents, Eugenius's physical health increasingly deteriorated. His heart condition required insertion of a defibrillator and pacemaker. He suffered a ministroke and had a bleeding ulcer. In 2006, he experienced a compression fracture and another one in July 2009. Following the 2009 fracture, Eugenius was hospitalized before being admitted to the Alden Rehabilitative Center in Naperville, where he remained until his death.

¶ 13 The parties assert that in the five years leading to his death, Eugenius was a physically disabled person as defined by section 11a-2 of the Probate Act of 1975 (755 ILCS 5/11a-2 (West 2008)). He made use of incontinence underwear and eventually required assistance changing it. He also required assistance taking baths and getting dressed. When Eugenius moved in with respondents, Rimas worked as a commodities broker for the Linn Group at the Chicago Board of Trade. However, from August 2004 until July 2009, Rimas gave up his job and provided around-the-clock care to Eugenius, including bathing, dressing, and changing him after he became incontinent. During that time, Rimas's wife, Rita, worked at MidAmerica Bank—now PNC Bank.

¶ 14 B. Eugenius's Bank Accounts and Related Transactions

¶ 15 While living in Florida, Eugenius had two bank accounts with AmSouth Bancorporation (AmSouth).[1] The first account (ASB-A) was held in joint tenancy with right of survivorship

---

[1]In their briefs, the parties provided us with the account numbers. To protect the parties' privacy, we replaced the numbers with alphabetic identifiers.

with his three children. The second account (ASB-B) was held in joint tenancy with Vale and their two sons. Also, while living in Florida, Eugenius and Vale purchased a condominium.

¶ 16 In November 2004, after he began living with Rimas, Eugenius and Rimas went to MidAmerica Bank together and opened a joint account (MAB-1), with right of survivorship. In the same week, Eugenius certified making a gift of $130,000 to Rimas. Eugenius then executed (1) a withdrawal order from his Pacific Life policy account, (2) an "Annuity Full Surrender Request" form on his Prudential Financial account, and (3) a "Lincoln Financial Distribution" request form. The Prudential Financial surrender was in the form of a check payable to Eugenius, whereas the Lincoln Financial distribution was made into the new MidAmerica Bank joint account.

¶ 17 In December 2004, Rimas sold his home in Wheaton. Using the sale's proceeds, which he added to a check in his name and drawn on the MidAmerica Bank account for $130,000, Rimas purchased a new house in Naperville, Illinois. Deacon Brooks testified that the new house was accommodating to Eugenius's physical infirmities with a ramp, easy access, and everything on one floor. These accommodations included a bedroom with a walk-in shower for Eugenius's convenience.

¶ 18 Around the same time, Eugenius sold his condominium in Florida by executing a warranty deed with Rimas signing as cotrustee on the deed. The proceeds of the sale, totaling $335,773.87, were deposited in the MidAmerica Bank joint account on December 24, 2004. The same day, Rimas executed a check from that account for $333,640.13. This amount was distributed in three certificates of deposits, which Eugenius and Rimas held in joint tenancy. These accounts were MidAmerica CD-A, MidAmerica CD-B, and MidAmerica CD-C.

¶ 19 The day before the deposits were made, Eugenius and Rimas went to MidAmerica Bank and opened another joint account (MAB-2). Between 2004 and 2009, Eugenius's social security and pension benefits in the total amount of $156,529 were deposited.

¶ 20 In 2007, Rimas deposited $46,402.75 from AmSouth account ASB-A and $14,058.13 from AmSouth account ASB-B into a money market held in his and Rita's name at MidAmerica Bank—account MAB-3. In April 2008, Rimas made out a check from account MAB-2 to Rita for $4000.

¶ 21 In 2009, Rimas made a series of financial transactions involving the various accounts. First, in January, he opened money market account (NCB-1) at National City Bank held solely in his name. He deposited $58,153.29 into this account drawn from MidAmerica CD-B. In September 2009, he paid himself $9000 for installation of Pella doors and paid $11,188 for the purchase and installation of Pella windows. Both payments came from joint account MAB-2. On November 25, 2009, he transferred $306,958.07 from MidAmerica CD-A into MidAmerica Bank account MAB-3, which he held in joint tenancy with Rita. Two days later, he transferred $100,000 from this joint account into a brokerage account held solely in his name. Finally, in June 2010, Rimas transferred $12,645.86 from MidAmerica CD-C into account MAB-3.

¶ 22                                    C. The Execution of Eugenius's New Will

¶ 23 On June 24, 2006, Eugenius executed a new will and revocable trust. He also executed a new power of attorney for property, an Illinois statutory short form power of attorney for health care, and a living will declaration. Under the new will and trust, Rimas would receive two-thirds of the estate, while Laima and Andrius would equally split the remaining one-third.

¶ 24　　Prior to the preparation of the estate documents, Rimas contacted Karl Smith, the attorney who prepared them. Smith and Rimas had been friends since high school. Beginning in the 1980s, they only spoke a couple of times per year, when Smith was preparing Rimas's taxes. Smith had also known Eugenius since 1970. Smith testified that he discussed the documents with Eugenius alone to be sure that it was actually Eugenius's desire to give two-thirds of his estate to Rimas. Smith did not ask Eugenius why he was making the changes because Smith had heard that Rimas "was the sibling paying attention" to Eugenius and "helping him." When Smith first met with Eugenius, he left blanks in the draft revocable trust. Smith explained that it was because he "didn't want to take a suggestion from some other family member and just plug it in." He "wanted to make sure it [was] what [Eugenius] wanted to do with his property." Eugenius lived another three years after executing the will and revocable trust.

## D. Proceedings Before the Trial Court

¶ 26　　Petitioners filed a complaint, alleging that Rimas had breached his fiduciary duties to Eugenius in initiating the various transfers and payments to himself and to Rita. They also alleged that the new estate documents were the results of undue influence. Rimas admitted that he was Eugenius's fiduciary after Vale died, but he denied the other allegations.

¶ 27　　Petitioners filed a motion for summary judgment requesting that the trial court enter an order directing respondents to return funds to Eugenius's estate and setting aside the operative estate documents. Respondents filed a cross-motion for summary judgment, requesting that judgment be entered in their favor.

¶ 28　　On July 13, 2018, the trial court entered summary judgment in favor of petitioners, directed respondents to pay $600,400 to Eugenius's estate, and set aside the new estate documents. Respondents filed a motion for reconsideration. The court denied the motion to reconsider. The court then considered petitioners' request for prejudgment interest. The court stated:

> "to be honest, I am not thrilled, but after hearing good arguments on both sides and reading the statute, 815 ILCS 205/2 regarding prejudgment interest rates appears to apply.
>
> And the prejudgment interest request is calculated by Mr. Marren [(Petitioners' counsel)]. I don't feel the Court has any discretion other than to adopt and grant that."

The trial court ordered respondents to pay $290,690.36 in prejudgment interest.

¶ 29　　Respondents now appeal.

## II. ANALYSIS

¶ 31　　On appeal, respondents argued that (1) the trial court erred in ordering respondents to reimburse Eugenius's estate with $600,400, (2) the court erred in setting aside Eugenius's estate documents executed on June 24, 2006, and (3) the court abused its discretion in ordering respondents to pay $290,690.36 in prejudgment interest. Respondents also requested that their cross-motion for summary judgment be granted. We affirm in part, reverse in part, and remand with directions.

### A. The Reimbursement of $600,400 to Eugenius's Estate

¶ 33　　On appeal, the parties repeat their arguments presented in their motions for summary judgment. Respondents advance three contentions: (1) that there was no breach of fiduciary

duty because the transfers were from joint accounts, (2) that, because Eugenius opened the accounts with Rimas while he was mentally competent to do so, the accounts evidence his intent to make a gift to Rimas, and (3) that Rimas acted within his rights to transfer the funds. Petitioners counter with two arguments: (1) that Rimas succeeded to a fully operational power of attorney with an active fiduciary relationship with his father upon his mother's death in 2001 and (2) that all of the transfers were presumptively fraudulent, and Rimas failed to rebut that presumption.

¶ 34 "We review summary judgment rulings *de novo*." *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 20. Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Internal quotation marks omitted.) *Id.* When, as here, the parties file cross-motions for summary judgment, they agree that only questions of law are involved and invite the court to decide the issues based on the record. *Id.* "However, the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28.

¶ 35 An individual holding a power of attorney is a fiduciary as a matter of law. *In re Estate of Shelton*, 2017 IL 121199, ¶ 22. Thus, when a person is designated as an agent under a power of attorney, he has a fiduciary duty to the person who made the designation. *Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 12. The fiduciary relationship between the principal and agent begins at the time the power of attorney document is signed. *In re Estate of Shelton*, 2017 IL 121199, ¶ 22.

¶ 36 A presumption of fraud arises when a fiduciary agent benefits from a transaction involving the principal. *Id.* ¶ 23. That is, "[t]he mere existence of a fiduciary relationship prohibits the agent from seeking or obtaining any selfish benefit for himself, and if the agent does so, the transaction is presumed to be fraudulent." *Spring Valley Nursing Center, L.P.*, 2012 IL App (3d) 110915, ¶ 12. Thus, "under a power of attorney for property, 'any conveyance of the principal's property that either materially benefits the agent or is for the agent's own use is presumed to be fraudulent.' " *In re Estate of Shelton*, 2017 IL 121199, ¶ 23 (quoting *Spring Valley Nursing Center, L.P.*, 2012 IL App (3d) 110915, ¶ 12). "This rule applies to conveyances of the principal's property by the agent to a third party on behalf of the principal and also to conveyances made by the principal directly to the agent." (Internal quotation marks omitted.) *Id.*

¶ 37 The presumption of fraud described above is not conclusive and may be rebutted by clear and convincing evidence to the contrary. *Spring Valley Nursing Center, L.P.*, 2012 IL App (3d) 110915, ¶ 13. The burden is on the agent to rebut the presumption by showing that he acted in good faith and that he did not betray the confidence placed in him. *Id.* If the agent satisfies that burden, the transaction in question will be upheld. *Id.* (citing 755 ILCS 45/2-7(a) (West 2010)). However, if the agent fails in that burden, the transaction will be set aside. *Id.* (citing 755 ILCS 45/2-7(a), (f) (West 2010)).

¶ 38 This case comes on appeal from cross-motions for summary judgment, where, on the pleadings, respondents admit that Rimas had a fiduciary relationship with his father, dating as far back as 2001. There is no genuine issue of material fact that the transfers from Eugenius's accounts into the joint accounts with Rimas and subsequently into accounts held solely by Rimas or by Rimas and Rita occurred during the fiduciary relationship. See *Bremer*, 2016 IL

119889, ¶ 20. There is also no question under the law that the transfers from principal to agent benefited the agent and gave rise to a presumption of fraud. See *Spring Valley Nursing Center, L.P.*, 2012 IL App (3d) 110915, ¶ 14. Thus, the transactions must be set aside unless the undisputed facts show that Rimas "acted in good faith and that he did not betray the confidence placed in him." *Id.* ¶ 13.

¶ 39    Respondents first argue that Eugenius was mentally competent when he opened the joint accounts with right of survivorship, wherein Rimas was included on the accounts. In support, respondents submit the testimony of several close acquaintances of Eugenius. The testimony showed that Eugenius never showed signs of confusion or absentmindedness. It also showed that Eugenius prolifically wrote articles for his church journal on matters of religion, history, and politics. Eugenius also gave sermons at his church and eventually officiated at the funeral of a lifelong friend's wife.

¶ 40    Petitioners, however, do not dispute that Eugenius was mentally competent. In fact, petitioners admit that, during the relevant period, Eugenius was competent and mentally sound. But that is not the relevant inquiry now before us. See *id.* ¶ 17. In *Spring Valley*, the agent benefitted from the transfer of the life estate from the principal and the sale of property formally held by the principal. *Id.* ¶ 15. The trial court found that the principal was "mentally competent" (*id.* ¶ 4), but the court nonetheless concluded that the agent had not met its burden of rebutting the presumption (*id.* ¶ 16). This court ruled: "Establishing that [the principal] was mentally competent, by itself, was not sufficient to rebut the presumption of fraud under the facts of the present case, in light of the obvious benefits of the transactions to [the agent]." *Id.* We concluded that the agent "presented no evidence to suggest that he was acting as directed by [the principal] when the transactions in question occurred." *Id.* Particularly, we noted that the presumptions of fraud were "strengthened" by the fact that no consideration was paid to the principal for the life estate and the principal received none of the proceeds of the sale of property. *Id.* ¶ 15.

¶ 41    *Spring Valley* is directly on point to the case at hand. Nothing in the testimony submitted regarding Eugenius's mental competency rebuts the presumption of fraud. None of the witnesses testified that Eugenius directed or initiated the transfers. In fact, nothing in the testimony shows that Eugenius or the witnesses knew of the transfers from Eugenius's accounts into the joint accounts and subsequently in the accounts under respondents' control.

¶ 42    Once a person becomes an agent for another, he owes him a common law fiduciary duty, creating a presumption of fraud on any transaction involving his principal and benefitting himself as the agent. *In re Estate of Shelton*, 2017 IL 121199, ¶¶ 22-23. Respondents present no evidence on the significant factors to be considered in determining whether the presumption of fraud has been rebutted. Those factors are (1) whether the fiduciary made a frank disclosure to the principal of the information he had, (2) whether the fiduciary paid adequate consideration, and (3) whether the principal had competent and independent advice. *Spring Valley Nursing Center, L.P.*, 2012 IL App (3d) 110915, ¶ 13.

¶ 43    The transfers benefited Rimas without any indication of consideration or compensation to Eugenius. Admittedly, Eugenius still retained interest in the funds while they were held in the joint accounts. But these accounts constituted an obvious benefit to Rimas in that he now had an interest in a fund he otherwise would not have had. The presumption of fraud attaches to any transaction that benefits the agent, even when "conveyances [are] made by the principal directly to the agent." *Id.* ¶ 12.

¶ 44      While Eugenius retained an interest in the joint accounts of which he was a named owner, he had no interest in Rimas's personal accounts nor the accounts held in joint tenancy by Rimas and Rita. Rimas, acting under the fiduciary relationship, also benefited personally from the $9000 payment to himself while paying Rita $4000 from the joint account held with his father. There is no indication in the record that Eugenius directed Rimas to make these payments. In contrast, the joint accounts were opened at MidAmerica Bank where Rita worked, with no indication that Eugenius had directed or authorized this use of his money or that he had been independently and competently advised on the implication of opening these accounts.

¶ 45      Furthermore, Rimas received $130,000 from Eugenius, which Rimas used for the purchase of a new home in Naperville. The purchase was allegedly done to accommodate Eugenius while he lived with respondents. But there is again no indication in the record that Eugenius received any consideration or interest in the home, despite the collateral he provided. In *Spring Valley*, we rejected the agent's assertion that the transfer and sale of property benefited the principal because the sale relieved her from repaying the tax liens on the property. *Id.* ¶¶ 15-16. We find the alleged benefit to Eugenius of accommodating living space less significant than that asserted in *Spring Valley* and conclude that it cannot be held as an interest in the home. There is no indication that Eugenius was informed about whether he had any interest in the new home and whether said interest would be accounted in his estate.

¶ 46      Respondents argue Eugenius is presumed to have gifted Rimas interests in the transferred funds simply by opening the joint accounts. "There is a presumption of donative intent where the proof shows that the making of a deposit and the execution of the joint tenancy account contract are in conformity with the [law]." *In re Estate of DeJarnette*, 286 Ill. App. 3d 1082, 1088 (1997) (citing *Murgic v. Granite City Trust & Savings Bank*, 31 Ill. 2d 587, 590 (1964)). "In order to go behind the terms of the joint account agreement, the one claiming adversely thereto has the burden of establishing by clear and convincing evidence that a gift was not intended." *Id.*

¶ 47      In an ordinary case, we would agree with respondent and apply the presumption of donative intent, requiring petitioners to establish "that a gift was not intended." See *id.* But here we also have the conflicting presumption of fiduciary fraud. As previously noted, the record strengthened this presumption as it showed that respondents benefitted from the financial transactions without any evidence that Eugenius was aware of these benefits. Citing *In re Estate of Copp*, 132 Ill. App. 2d 974 (1971), respondents argue the presumption of donative intent should supersede the presumption of fraud. We disagree with respondents and reject *Copp* insofar as it establishes the presumption of donative intent as superseding the presumption of fraud.

¶ 48      First, in *Copp*, the evidence supported "the finding of a donative intent and the desire of [the] decedent to vest ownership in the surviving joint tenant." *Id.* at 978. In the presence of two hospital employees, the decedent completed a signature card creating the joint account, while saying to the tenant, " '[Y]ou have been good to me. You have been upright and honest and I want you to have what's in the bank.' " *Id.* at 976. Additionally, the testimony in *Copp* suggested that the decedent was possibly aware of her imminent death when she created the joint account. She was over 90 years old at the time. She became ill about a month before the account was created. *Id.* at 975-76. She specifically requested that the tenant obtain the necessary documents from the bank. *Id.* at 976. She died within days of creating the joint accounts. *Id.* Unlike in *Copp*, respondents have failed to provide any testimony or evidence

tending to support Eugenius's intent to separately give Rimas the funds in the joints account as a last gesture of gratitude. Moreover, the accounts were all opened at MidAmerica Bank where Rita worked and at various lengthy periods of time before Eugenius died.

¶ 49 And second, as noted, respondents in this case do not dispute that a fiduciary relationship existed. In contrast, the facts in *Copp* never established the existence of a fiduciary relationship between the decedent and the tenant. The facts only established such a relationship between the tenant's husband, acting as executor of the estate, and the decedent. *Id.* at 975-76. The party seeking recovery on the account claimed, without evidence, that the relationship existed (*id.* at 977), and we made an assumption that it did (see *id.* at 980 ("assuming that a fiduciary relationship did in fact exist")). Thus, this portion of the opinion is merely *dicta* and should not be followed as binding on this case.

¶ 50 Instead, we find the reasoning in *DeJarnette* more compelling than a blind application of *Copp*. Where the joint accounts predate the fiduciary relationship, the presumptions would cancel each other so long as the "deposits made during the fiduciary relationship followed a procedure established prior to the relationship." *In re Estate of DeJarnette*, 286 Ill. App. 3d at 1089. When the presumptions cancel each other, "the trial court [is] required to decide the case on the evidence before it of donative intent and undue influence." *Id.* But "where the attorney-in-fact actively uses his position to create the joint tenancies the presumptions do not cancel; instead, the controlling presumption is the presumption of fraud, which requires strong evidence to overcome." *Id.*

¶ 51 Here we have a mixed situation. The joint accounts held at AmSouth Bank predate the fiduciary relationship because they were opened while Vale was still alive and Rimas had not succeeded her as Eugenius's attorney-in-fact. But no challenged "deposits" were made into these accounts. Instead, transfers were made from the AmSouth Bank accounts into the subsequent accounts opened after the fiduciary relationship was created.

¶ 52 Clearly, the presumptions would not cancel each other out, since the deposits benefiting Rimas were made after the creation of the fiduciary relationship. See *id.* Nor is it clear whether Rimas "actively" used his position as Eugenius's attorney-in-fact to create the joint accounts. But, as previously noted, we consider it problematic that all the challenged accounts were opened at MidAmerica Bank where Rita worked during the relevant times. For all of the foregoing reasons, we hold that the trial court properly granted petitioners' motion for summary judgment and ordered respondent to reimburse $600,400 to Eugenius's estate.

¶ 53                 B. The Setting Aside of Eugenius's 2006 Last Will and Testament

¶ 54 The trial court also granted petitioners' request to set aside Eugenius's estate documents executed on June 24, 2006. Petitioners argue that respondents exercised undue influence on Eugenius to change his will in favor of Rimas to their detriment. Respondents in turn contend that Eugenius was intellectually capable and of sound mind. Respondents thus argue that Eugenius changed his will and determined its dispositions independently and without undue influence.

¶ 55 In Illinois, undue influence is " 'any improper *** urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely.' " (Internal quotation marks omitted.) *In re Estate of Kline*, 245 Ill. App. 3d 413, 422 (1993) (quoting *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 460 (1983)). To set aside a will, the influence "must be of such a nature as to destroy the

testator's freedom concerning the disposition of his estate and render his will that of another." *Franciscan Sisters*, 95 Ill. 2d at 460.

¶ 56 A rebuttable presumption of undue influence arises when a petitioner establishes four elements:

"(1) a fiduciary relationship between testator and a person who receives a substantial benefit under the will (compared to other persons who have an equal claim to testator's bounty);

(2) a testator in a dependent situation in which the substantial beneficiaries are in dominant roles;

(3) a testator who reposed trust and confidence in such beneficiaries; and

(4) a will prepared or procured and executed in circumstances wherein such beneficiaries were instrumental or participated." (Internal quotation marks omitted.) *In re Estate of Kline*, 245 Ill. App. 3d at 422.

¶ 57 Once these elements are established, "the burden of production shifts to the respondent, who must produce evidence that rebuts the presumption of undue influence." *Id.* at 423. But, "the burden of persuasion remains with the petitioner." *Id.* (citing *Franciscan Sisters*, 95 Ill. 2d at 462).

¶ 58 In *Estate of Kline*, this court recognized two ways a respondent may attack a presumption of undue influence. *Id.* First, the respondent may "[i]ntroduce evidence tending to disprove the existence of the basic facts on which the presumption depends." (Internal quotation marks omitted.) *Id.* And second, the respondent "may offer evidence tending to disprove the presumed fact itself." (Internal quotation marks omitted.) *Id.* The chosen mode of attack is critical as it establishes the court's role in determining the issue presented. *Id.* at 424. If the respondent attacks the *basic* facts, "then an issue of fact is presented as to their existence." (Internal quotation marks omitted.) *Id.* But if the *presumed* facts are attacked, "the court must determine whether the presumption remains." (Internal quotation marks omitted.) *Id.* Whether the presumption remains is a question of law that raises no issues of fact. See *id.* at 423.

¶ 59 Respondents argue that the undisputed facts do not show that the will was "prepared or procured and executed in circumstances wherein" Rimas was "instrumental or participated." Respondents do not dispute the underlying facts that petitioners alleged, but instead contend that those facts do not establish Rimas's instrumentality in procuring the will. Respondents' contention raises a question of law by challenging the presumed fact. See *id.* We agree with respondents and reverse the trial court's decision granting petitioners' motion for summary judgment and setting the will aside.

¶ 60 We first note that respondents cite *Estate of Kline* to argue that Smith's involvement in preparing Eugenius's new will is not problematic. We find *Estate of Kline* factually distinguishable but still instructive on this issue. In *Estate of Kline*, the attorney who prepared the will advised the mother to hire another attorney to review the codicil because he felt there was a conflict of interest if he did so. *Id.* at 427. The first attorney gave the mother "the names of several attorneys," and she picked a new attorney. *Id.* at 421. The presence of conflict-free counsel was helpful. However, counsel's conduct was dispositive. The new attorney consulted the mother in private and refused to execute the codicil until after he was sure the mother had the capacity to make testamentary change. *Id.* at 421-22. Essentially, counsel's conduct broke the link between the will's beneficiary and its procurement.

¶ 61        Here, although Rimas reintroduced Eugenius to Smith, we find Smith's conduct did not create a presumption that Rimas was instrumental in the procurement of the will. Regardless of Rimas's motives in recommending Smith, Smith testified that he met with Eugenius alone, that he left parts of the will blank to avoid steering Eugenius's decision, and that he was persuaded and confident that Eugenius could make his own decisions. Therefore, summary judgment cannot be sustained on this issue. This part of the trial court's order, granting petitioners' motion for summary judgment, is reversed and the issue remanded for resolution by the trier of fact.

¶ 62                    C. The Imposition of $290,690.63 in Prejudgment Interest

¶ 63        Prejudgment interest may be awarded in two instances. *Prignano v. Prignano*, 405 Ill. App. 3d 801, 821 (2010). First, it is available in actions at law where recovery is available "only under the Interest Act or if the parties' agreement provides for it." *Id.* (citing *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 257 (2006)). Second, it is available in actions in equity where prejudgment interest recovery is " 'within the sound discretion of the judge and is allowed where warranted by equitable considerations' " (internal quotation marks omitted) (*id.* (quoting *Tri-G, Inc.*, 222 Ill. 2d at 257)). Cases involving the breach of fiduciary duty are treated as causes of action in equity. *Id.* This case falls under the second category because petitioners' claims for reimbursement alleged a breach of fiduciary duty.

¶ 64        "The determination of whether equitable circumstances support an award of interest lies within the discretion of the trial court." *Tully v. McLean*, 409 Ill. App. 3d 659, 685 (2011) (citing *In re Estate of Wernick*, 127 Ill. 2d 61, 87 (1989)). Thus, a trial court's decision to set a prejudgment interest rate will not be disturbed unless it is an abuse of the court's discretion. *Id.*

¶ 65        Here, the trial court did not exercise its discretion. In fact, the trial court concluded that it had no discretion to determine whether to order the interest, and the Interest Act required it to set the interest at the rate requested. "Where, as here, a trial court fails to exercise its discretion due to an erroneous conclusion that it has no discretion, its decision must be reversed." *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 31; see also *Bjork v. O'Meara*, 2013 IL 114044, ¶ 31 ("Error is committed when a trial court refuses to exercise its discretion in the erroneous belief that it has no discretion as to the question presented.").

¶ 66        We thus reverse the trial court's imposition of $290,690.63 in prejudgment interest, and remand the case with directions that (1) the trial court exercise its discretion, (2) conduct an equitable circumstances analysis, as determined in *In re Estate of Wernick*, and (3) impose a prejudgment interest rate and amount it deems appropriate. Our decision does not touch on the propriety of the interest rate imposed in this case. We simply find the trial court failed to exercise its discretion in assessing it.

¶ 67                                  III. CONCLUSION

¶ 68        The judgment of the circuit court of Will County is affirmed in part, reversed in part, and remanded with directions.

¶ 69        Affirmed in part and reversed in part.

¶ 70        Cause remanded with directions.