NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230358-U

NOS. 4-23-0358, 4-23-0359 cons.

FILED
January 22, 2024
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF MILO O. MUNDORFF JR., Deceased, | ) ) ) | Appeal from the Circuit Court of Whiteside County. |
| (Richard K. Mundorff, | ) | Nos. 15CH71 |
| Petitioner-Appellant, | ) | 17P147 |
| v. | ) | |
| Christopher G. Campbell, | ) | Honorable |
| Respondent-Appellee). | ) | Patricia Ann Senneff, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's findings were not against the manifest weight of the evidence where it concluded that the decedent's agent rebutted the presumption of undue influence with clear and convincing evidence that his personal use of funds in a joint checking account was fair and did not result from his undue influence over the decedent.

¶ 2     These consolidated appeals revolve around respondent Christopher G. Campbell's personal use of funds in a joint checking account held with his grandfather, decedent Milo O. Mundorff Jr., beginning in 2005. It is undisputed that Christopher had been Milo's agent since 1999, although the parties dispute whether Christopher was acting pursuant to his agency authority when using the joint account. In 2015, petitioner Richard K. Mundorff, who is Milo's son and Christopher's uncle, filed a complaint for an accounting under the Illinois Power of Attorney Act

(755 ILCS 45/2-7 (West 2014)). After Milo passed away in 2017, Richard filed a petition for a citation to recover assets on behalf of Milo's estate under the Probate Act of 1975 (755 ILCS 5/16-1 (West 2020)). In March 2023, the trial court held a consolidated trial and entered judgment against Richard in both cases.

¶ 3        The parties raise several arguments that we group into three overarching issues: (1) whether Christopher's personal use of the funds is subject to the presumption of undue influence or the conflicting presumption of donative intent, (2) whether the trial court erred in admitting a 2015 document purporting to authorize Christopher's personal use of the funds over Richard's objection that its admission violated the Dead Man's Act (735 ILCS 5/8-201 (West 2022)), and (3) whether the court's finding that Christopher rebutted the presumption of undue influence with clear and convincing evidence of good faith is against the manifest weight of the evidence. As explained further below, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5        While the proceedings below have a long and complex procedural history, we limit our discussion to the specific points argued by Richard, which focus on Christopher's personal use of funds in one joint checking account.

¶ 6        Milo executed a durable power of attorney in 1999, appointing Christopher as his agent with general power, including power over Milo's property and finances. On November 2, 2005, Milo opened a joint checking account with right of survivorship, naming Christopher as the other joint holder of the account. On November 3, Milo executed a statutory short form power of attorney for property (see 755 ILCS 45/3-3 (West 2004)), again naming Christopher as his agent with general power over his property and finances, including power over financial institution transactions and transactions involving retirement plans, Social Security, and employment and

military service benefits. On November 4, Christopher signed the "Backup Withholding Certifications" portion of the joint account paperwork as "Milo Mundorff by Christopher Campbell, P.O.A."

¶ 7 In 2007, Christopher took over the management of Milo's finances from Milo's wife, who fell ill and later passed away. Each month, Milo had his retirement, Social Security, and pension benefits deposited into the joint account. Christopher used those funds to pay all of Milo's monthly expenses, then used the residual funds to pay his own expenses. During the period at issue in this case, Christopher spent $97,896.03 of the joint account funds on himself, primarily payments to grocery stores, department stores, gas stations, banks, insurance companies, and the secretary of state, among a variety of other recipients.

¶ 8 In February 2015, Milo executed a typewritten document purporting to authorize this practice, retroactive to 2007, stating:

> "I specifically require that all of my own expenses be paid first and kept up to date and current and that any amount beyond what is required to pay my monthly expenses be allocated for his personal use. I do have the stipulation that he not spend this money in a foolish manner. It must be used for things such as groceries, heating fuel, electric, paying down of any outstanding debt that would avoid any possible foreclosure, bankruptcy, or other default of credit."

The document was signed by Milo and an unknown witness, but it was not notarized. Christopher testified that he "presented" this document to Milo. The specific circumstances of its creation and execution are unclear.

¶ 9 Later in 2015, Richard filed a complaint in Whiteside County case No. 15-CH-71, seeking an accounting from Christopher of the amounts he received during his term as Milo's

agent. (The complaint does not make clear what standing Richard would have had to seek an accounting with respect to the funds of Milo, who was then still living.) After Milo passed away in 2017, Richard filed a petition as an "interested person" for a citation to recover assets on behalf of Milo's estate in Whiteside County case No. 17-P-147, seeking restoration of the funds to the estate and reimbursement of Richard's attorney's fees and costs. See 755 ILCS 5/16-1 (West 2020).

¶ 10        In March 2023, the trial court held a consolidated trial at which Christopher was the only witness. The administrator of Milo's estate, attorney Lon Richey, appeared briefly to inform the court that he was "philosophically aligned" with Richard, but the administrator did not further participate in the trial.

¶ 11        Richard raised a standing objection to Christopher's testimony on the grounds that it violated the Dead Man's Act, which generally disallows a person with a direct interest in a case involving a deceased person's estate from "testify[ing] on his or her own behalf to any conversation with the deceased *** or to any event which took place in the presence of the deceased," except in circumstances not applicable here. 735 ILCS 5/8-201 (West 2022). The trial court explained that it would hear Christopher's testimony over Richard's objection and then address admissibility under the Dead Man's Act in its written order.

¶ 12        Christopher authenticated the documentary evidence concerning the account and testified that he always paid Milo's bills from the account first and that there were no instances where Milo's bills were not paid. Christopher testified to the foundation for the 2015 document by stating that he had witnessed Milo signing it, but also by stating that he recognized Milo's signature on the document. Richard objected to admission of the document on the bases of the Dead Man's Act and hearsay, though he did not specify that he had an objection to the foundation for admission

of the document. The trial court admitted the 2015 document over Richard's objection that it was hearsay and its admission violated the Dead Man's Act.

¶ 13　　　　After the trial, the trial court filed an opinion and order containing its findings of fact and conclusions of law. The court stated that it disregarded those portions of Christopher's testimony that it believed to be in violation of the Dead Man's Act, without further explanation. The court concluded that the 2015 document was admissible, specifically noting that "[n]o objection was made by Richard to admission of the document on a foundational basis, only upon application of the Act." The court found, however, that even without considering the 2015 document, Christopher "ha[d] rebutted, by clear and convincing evidence, the presumption of undue influence and fraud and that his actions were in good faith." The court entered judgment against Richard in both cases.

¶ 14　　　　This appeal followed.

¶ 15　　　　　　　　　　　　II. ANALYSIS

¶ 16　　　　We group the parties' arguments into three overarching issues: (1) whether Christopher's personal use of the funds is subject to the presumption of undue influence or the conflicting presumption of donative intent, (2) whether the trial court erred in admitting the 2015 document purporting to authorize Christopher's personal use of the funds over Richard's objection that its admission violated the Dead Man's Act, and (3) whether the court's finding that Christopher rebutted the presumption of undue influence with clear and convincing evidence of good faith is against the manifest weight of the evidence.

¶ 17　　　　As an overview, we note that there are at least four legal theories by which Christopher could have become the owner of the funds in the joint account: (1) the deposits could have constituted payments from Milo pursuant to a contract for Christopher's services; (2) Milo's

deposits into the account could have been gifts to Christopher; (3) Milo's deposits could have been conditional gifts of the "net" deposit to Christopher, conditioned on payment of Milo's expenses (see *In re Estate of McVicker*, 39 Ill. App. 2d 389, 395 (1963) ("A donor's express reservation of dividends or interest from the principal of a gift does not impair its validity.")); or (4) ownership could have transferred to Christopher outright at the time of Milo's death due to Christopher's status as a survivor beneficiary of the account.

¶ 18        In this case, Christopher does not argue the first theory (contract). Superficially, he appears to argue the second theory (gift), but his position makes that impossible. Christopher concedes that he was obligated to pay Milo's expenses, which would be incompatible with the contention that the deposits were an outright gift. We think Christopher's position is perhaps best viewed as the third theory, a conditional gift. We will, therefore, examine below the competing presumptions applicable to the transactions in the context of a conditional gift.

¶ 19        We note, however, that neither party seems to have recognized the fourth theory in which Christopher might obtain outright ownership of the joint account: survivorship. It appears indisputable that, as of Milo's death on July 28, 2017, Christopher became the account's sole owner. *Konfrst v. Stehlik*, 2014 IL App (1st) 132113, ¶ 12 ("Upon the death of a joint tenant, title passes by operation of law to the survivor."). Consequently, any funds which might be recovered here would be for the benefit of the surviving account owner—Christopher—and not Milo's estate. See *id.* ( "[T]he entire property goes to the surviving tenant and cannot be inherited by another through a will or as part of the decedent's estate."). Had the challenged transactions never occurred, those funds would have remained in the account and would have become solely Christopher's property in 2017. If Christopher were ordered to repay these amounts into the joint account, it would be a matter of moving the funds from one of Christopher's pockets to another. This

conclusion raises questions about whether the estate and Richard were even proper parties here, or whether they sustained any loss that could be compensated. Regardless, as discussed below, the trial court's judgment is sustainable under the analysis on which it relied.

¶ 20                    A. Presumptions Governing the Transactions

¶ 21        It is undisputed that Christopher became Milo's agent with the execution of the durable power of attorney in 1999 and remained Milo's agent after the execution of the 2005 power of attorney and until Milo's death. The consequences of this appointment are well established:

> "An individual holding a power of attorney is a fiduciary as a matter of law. [Citations.] Thus, an agent appointed under a power of attorney has a common-law fiduciary duty to the principal. [Citations.] The fiduciary relationship between the principal and agent begins at the time the power of attorney document is signed. [Citations.]
>
> A presumption of fraud arises when a fiduciary benefits from a transaction involving the principal. [Citation.] Under a power of attorney for property, any conveyance of the principal's property that either materially benefits the agent or is for the agent's own use is presumed to be fraudulent. [Citation.] This rule applies to conveyances of the principal's property by the agent to a third party on behalf of the principal and also to conveyances made by the principal directly to the agent. [Citation.] Once a fraudulent transaction has been alleged, the burden then shifts to the agent to prove by clear and convincing evidence that the transaction was fair and did not result from his undue influence over the principal. [Citation.]"

(Internal quotation marks omitted.) *In re Estate of Shelton*, 2017 IL 121199, ¶¶ 22-23.

¶ 22 Christopher contends that he did not owe Milo a fiduciary duty with respect to the funds in the account because, when spending those funds, he was acting as a joint owner of the account and not pursuant to the power of attorney. This contention is not entirely consistent with the evidence, as Christopher signed account paperwork as "P.O.A." In any event, the long line of precedent recognized in *Shelton* holds that a fiduciary relationship was established with the signing of the power of attorney for property in 1999. *Id.*; see, *e.g.*, *In re Guardianship of Spinnie*, 2016 IL App (5th) 150564, ¶ 26 ("The [agent's] duty was not limited only to transactions invoking her power of attorney."); but see *In re Estate of Stahling*, 2013 IL App (4th) 120271, ¶ 26 (finding presumption of undue influence did not extend to property and financial transactions between principal and agent when power of attorney was "limited solely to matters involving the principal's health care"). The supreme court reaffirmed this rule in a recent case, explaining that the principal and agent in that case had a fiduciary relationship for purposes of the presumption of undue influence even though the agent had never exercised the power of attorney before the challenged transaction took place. *In re Estate of Coffman*, 2023 IL 128867, ¶ 62. Accordingly, the presumption of undue influence applies to Christopher's personal use of Milo's property, which here would extend to Milo's deposit of funds into what was a joint account. See *Shelton*, 2017 IL 121199, ¶ 23; *Spinnie*, 2016 IL App (5th) 150564, ¶ 26.

¶ 23 Christopher argues that the presumption of donative intent should apply to Milo's depositing of funds into the account because it was opened as a joint account with the right of survivorship. See *Tummelson v. White*, 2015 IL App (4th) 150151, ¶ 32 ("When a joint tenant of a bank account deposits funds into the account, the presumption is that he or she does so with the

intent to make a gift of those funds to the other joint tenant."). The presumption of donative intent can be overcome with clear and convincing evidence that a gift was not intended (*In re Estate of Gerulis*, 2020 IL App (3d) 180734, ¶ 46), for instance if the account was merely a "convenience account" intended to allow the agent to make transactions only as specified by the principal and on his behalf (*Tummelson*, 2015 IL App (4th) 150151, ¶ 33).

¶ 24　　　　As discussed above, Christopher's argument does not entirely square with his own testimony. He has never disputed that he was obligated to pay Milo's expenses out of the joint account. Consequently, as discussed above, Milo's deposits into the account could potentially be, at best, a conditional gift to Christopher. Even if the gift is conditional, it is necessary to determine whether the deposits into the joint account create the presumption of a gift in light of the competing presumption operating against a fiduciary. The parties understandably disagree as to how these conflicting presumptions should be resolved, given that the presumption of undue influence would have to be rebutted by Christopher and the presumption of donative intent would have to be rebutted by Richard. Although Christopher does cite one case where this court held that the presumption of donative intent prevailed (*In re Estate of Copp*, 132 Ill. App. 2d 974, 980 (1971)), that holding has more recently been recognized as *dicta* that should not be followed (*Gerulis*, 2020 IL App (3d) 180734, ¶ 49). Instead, the established approach is to apply the presumption of undue influence unless the fiduciary had no active involvement in the creation of the joint account and "the 'deposits made during the fiduciary relationship followed a procedure established prior to the relationship,' " in which case the presumptions cancel each other and the case is simply decided on the evidence of donative intent and undue influence. *Id.* ¶ 50 (quoting *In re Estate of DeJarnette*, 286 Ill. App. 3d 1082, 1089 (1997)).

¶ 25 Although the parties dispute how active a role Christopher played in the opening of the joint account in 2005, there is no question that he had been Milo's agent since 1999 and that the depositing of funds did not follow a procedure established before 1999. See *id.* ¶¶ 50-52. As such, we find that the presumption of undue influence controlled and that Christopher was required to rebut the presumption with clear and convincing evidence that Milo's authorization of Christopher's personal use of the joint account funds "was fair and did not result from [Christopher's] undue influence over [Milo]." *Shelton*, 2017 IL 121199, ¶ 23; see *In re Estate of Rybolt*, 258 Ill. App. 3d 886, 890 (1994) ("If the presumption of fraud can be offset by a presumption of donative intent through joint tenancy with right of survivorship, then greed will often win out.").

¶ 26                    B. Admission of the 2015 Document

¶ 27 Richard argues that the trial court erred by admitting the 2015 document purporting to authorize Christopher's personal use of the residual funds over Richard's objection that its admission violated the Dead Man's Act. "Application of the Dead Man's Act is an evidentiary matter and will be reviewed for an abuse of discretion." *Morrow v. Pappas*, 2017 IL App (3d) 160393, ¶ 39. Furthermore, the erroneous admission of evidence under the Dead Man's Act is reversible error only if the party seeking reversal can show prejudice. *In re Estate of Goffinet*, 318 Ill. App. 3d 152, 156 (2001); see Ill. R. Evid. 103(a) (eff. Oct. 15, 2015) (stating the erroneous admission of evidence is reversible only if "a substantial right of the [objecting] party is affected").

¶ 28 A preliminary concern here is Richard's standing to invoke the Dead Man's Act at all. Richard was a party as an individual to the accounting action. In the probate action, he contended he was an "interested person" seeking a citation. Attorney Lon Richey, not Richard, was appointed independent administrator of the estate. With Richard's acquiescence, the

administrator did not participate in the trial proceedings below. "It is the representative who is entitled to raise the objection that an adverse party or interested person is incompetent to testify." *In re Estate of Sewart*, 274 Ill. App. 3d 298, 308 (1995). Because the estate representative never invoked the Dead Man's Act at trial, it is unclear what basis Richard would have for doing so.

¶ 29       Beyond standing to invoke the Dead Man's Act, we must also understand precisely what the statute prohibits: *testimony* regarding conversations and events which took place in the presence of the decedent. 735 ILCS 5/8-201 (West 2022). The 2015 document *itself* does not constitute testimony from Christopher at all. Richard lodged a general objection to Christopher's testimony concerning the circumstances of the creation of the 2015 document, but the trial court found that he failed to specifically object to the adequacy of the foundation for admission of the document.

¶ 30       On appeal, Richard more clearly articulates that the foundation for admission of the document was Christopher's testimony about its creation, but to avoid forfeiture of this argument on appeal, Richard was required to make a timely and specific objection before the trial court. Ill. R. Evid. 103(a)(1) (eff. Oct. 15, 2015); see *Fenton v. City of Chicago*, 2013 IL App (1st) 111596, ¶ 36 ("[T]he party wishing to exclude evidence has the burden to properly inform the trial judge as to the specific nature of its objection to the proffered testimony."). The purpose of requiring specificity is " 'to disclose the nature of the objection, inform the trial court as to the particular frailty, and enable the party offering the objectionable testimony to confront the objection.' " *Bafia v. City International Trucks, Inc.*, 258 Ill. App. 3d 4, 8 (1994) (quoting *Kapelski v. Alton & Southern R.R.*, 36 Ill. App. 3d 37, 43 (1976)). Because a lack of proper foundation can be easily remedied, "the objecting party must make the objection in order to allow an opportunity to correct

it." *Id.*; see *People v. Korzenewski*, 2012 IL App (4th) 101026, ¶ 7 (noting the importance of an objection because a lack of foundation is easily cured).

¶ 31        We agree with the trial court's conclusion that Richard's objections to Christopher's testimony did not specifically challenge the sufficiency of the foundation for the 2015 document. By failing to invite Christopher or the court to address this specific error during the proceedings below, Richard has forfeited it on appeal. " 'A party cannot sit idly by while the trial court undertakes a course of action and then allege error in that regard.' " *Meeks v. Great America, LLC*, 2017 IL App (2d) 160655, ¶ 14 (quoting *Tokar v. Crestwood Imports, Inc.*, 177 Ill. App. 3d 422, 434 (1988)). Indeed, we have no way to know whether Christopher had other evidence of authenticity that he could have introduced had he known his testimony would be insufficient. See *People v. Watts*, 2022 IL App (4th) 210590, ¶ 81 (noting the low evidentiary bar required for authentication).

¶ 32        Furthermore, even if the foundational challenge to admission of the 2015 document were not forfeited, we would not find error in its admission. Putting aside Christopher's testimony about the circumstances of the document's execution, he also testified that he recognized the signature on the document as Milo's. This is not testimony concerning a *statement* from Milo, nor is it about an *event* which took place in Milo's presence so much as a presumed byproduct of some past event of signing. Even if Christopher had not witnessed Milo sign the document, Christopher could still authenticate Milo's signature by offering his own lay testimony that he could identify it. Ill. R. Evid. 901(b)(2) (eff. Sept. 17, 2019); but see *Oliver v. Oliver*, 313 Ill. 612, 625 (1924) (ruling that interested witness was incompetent to testify, but under a prior version of the statute imposing blanket incompetence). Similarly, the trial court, as the trier of fact, could have found the signature to be Milo's by comparison with the other signature samples introduced into

evidence. Ill. R. Evid. 901(b)(3) (eff. Sept. 17, 2019). There was an ample basis in the record for admission of the 2015 document even without Christopher's testimony about the circumstances of its execution.

¶ 33      Finally, we note that in the conclusion sections of his briefs, Richard attempts to reassert his argument that the 2015 document was also inadmissible hearsay; however, the written admission of a decedent is not hearsay when offered against the decedent's estate. *In re Estate of Rennick*, 181 Ill. 2d 395, 405 (1998); see Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015).

¶ 34                          C. The Trial Court's Finding of Good Faith

¶ 35      As noted above, Christopher was obligated to prove by clear and convincing evidence that his personal use of Milo's funds was fair and did not result from undue influence. *Shelton*, 2017 IL 121199, ¶ 23. When we review the trial court's conclusion that the presumption of undue influence has been rebutted, we defer to its findings of fact and reverse only if its conclusion is against the manifest weight of the evidence, meaning "it is clearly evident from the record that the opposite conclusion should have been reached or *** the ruling itself is arbitrary, unreasonable, or not based on the evidence presented." *Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 14.

¶ 36      Richard acknowledges that we "ordinarily" apply the manifest weight standard, but he raises the puzzling argument that our review should instead be *de novo* because "deference is improper if it effectively vitiates a necessary burden of proof." See *Best v. Best*, 358 Ill. App. 3d 1046, 1054 (2005), *aff'd*, 223 Ill. 2d 342 (2006). However, *Best* was not addressing our well-established deference to the trial court's *findings of fact* but deference to the trial court's *discretion*, which cannot sustain an evidentiary finding because discretion is not evidence. See *id.* (citing *In re D.T.*, 212 Ill. 2d 347, 354-56 (2004)). Assuming Richard's argument is that a trial

court errs by disregarding a necessary burden of proof, the manifest weight standard accounts for that possibility because a ruling is against the manifest weight of the evidence when it is "arbitrary, unreasonable, or not based on the evidence presented." *Spring Valley*, 2012 IL App (3d) 110915, ¶ 14. Richard does not actually argue that the court's ruling was arbitrary, unreasonable, or not based on the evidence presented, nor do we find as much, so we will reverse "only if it is clearly evident from the record that the opposite [of the trial court's] conclusion should have been reached." *Id.*

¶ 37        Although Richard emphasizes that he did not have the burden of persuasion before the trial court, he glosses over the fact that "an appellant has the burden of persuasion on appeal." *Yamnitz v. William J. Diestelhorst Co.*, 251 Ill. App. 3d 244, 250 (1993); see *Spring Valley*, 2012 IL App (3d) 110915, ¶ 14 ("A trial court's determination as to whether a presumption of fraud has been overcome, made after an evidentiary hearing, is entitled to deference ***."). Thus, while Richard was free to introduce no rebuttal evidence at trial, he did so at his own peril, because he is now armed with only the presumption of undue influence when attempting to persuade us that the opposite of the court's conclusion is clearly evident from this record.

¶ 38        Richard primarily focuses on the long-standing principle that the self-serving testimony of a witness attempting to rebut the presumption of undue influence is subject to careful scrutiny, even when it is admissible under the Dead Man's Act. See *In re Estate of Hinthorn*, 116 Ill. App. 3d 37, 43 (1983) (citing *In re Estate of Skinner*, 111 Ill. App. 2d 267 (1969)). This does not mean, however, that Christopher's testimony was not evidence. This court has long held that such testimony "will be carefully scrutinized *as well as considered with all other evidence in the case*." (Emphasis added.) *In re Estate of Hackenbroch*, 35 Ill. App. 2d 155, 162 (1962).

¶ 39    We have no indication that the trial court failed to carefully scrutinize Christopher's testimony. For instance, Christopher testified that he never transacted business under the terms of the power of attorney, but the court found otherwise because Christopher had signed the joint account paperwork as "Milo Mundorff by Chris Campbell P.O.A."

¶ 40    Moreover, the trial court was well aware when it heard Christopher's testimony that he had a significant financial interest in the outcome of the case, and it nevertheless concluded that Christopher had met his burden of proof. The trial court's evaluation of an interested witness's credibility "is subject to great deference," and reviewing courts "will not substitute our judgment on credibility matters[,] because the fact finder is in the best position to evaluate the conduct and demeanor of the witnesses." *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 548 (2007).

¶ 41    At bottom, Richard's argument is that Christopher's testimony was "poor-quality evidence" that the trial court should not have accepted and the rest of the evidence was tainted by Christopher's testimony and must fall along with it. However, self-serving testimony supported by sufficient corroborative evidence can supply clear and convincing proof to rebut the presumption of undue influence. *Hackenbroch*, 35 Ill. App. 2d at 162. While Richard decries the lack of unbiased third-party testimony, he points to no requirement that the corroborative evidence must take the form of third-party testimony, nor does he acknowledge that he introduced or failed to object to much of the documentary evidence he now claims is tainted. Even then, he forfeited his challenge to the authenticity of the 2015 document by failing to raise a specific objection, and he has forfeited his remaining objections by failing to argue them on appeal.

¶ 42        In addition to Christopher's testimony and the documentary evidence, the trial court placed significant weight on circumstantial evidence of the history of Milo and Chistopher's overall course of dealing, explaining:

> "[T]he evidence showed that Milo, who was never found to be incompetent, authorized these transactions as payment for the many services that Chris provided to Milo over the years. The Court recognizes that mental competency, alone, does not rebut the presumption of fraud. However, the evidence is unrefuted that Chris was the person who paid all of Milo's personal expenses and those associated with [Milo's] rental property, ran his errands, supervised his rental property, collected rents, arranged for repairs to the rental property, visited Milo, and attended to the myriad of details involved in managing another individual's personal affairs."

¶ 43        These findings are consistent with the evidence introduced at trial, which showed that Milo took active steps to manage his estate, including establishing a family trust and executing powers of attorney. In 2015, Milo executed a new will with the assistance of an attorney recommended by his nursing home, increasing Christopher's share of his estate from 50% to 55%. Christopher's log of expenses, which Richard himself introduced, showed that Christopher visited Milo numerous times between 2011 and 2017. Milo never took any action to change the status quo, even after Milo became aware of Richard's 2015 lawsuit against Christopher for allegedly mishandling Milo's funds. The trial court reasonably inferred from these facts that Milo was aware and approved of how his income was being used and continued to authorize Christopher's personal use of the excess funds in the joint account. The court further relied on the 2015 document to bolster Christopher's claim that Milo approved of the manner in which the joint account funds were used.

¶ 44    Ultimately, the trial court concluded that Christopher's testimony, corroborated by the documentary evidence and circumstantial evidence of good faith, won out over Richard's case, which consisted solely of the presumption of undue influence. It is not clearly evident from this record that the court should have reached the opposite conclusion.

¶ 45                                III. CONCLUSION

¶ 46    For the reasons stated, we affirm the trial court's judgment.

¶ 47    Affirmed.