2025 IL App (1st) 240913-U

THIRD DIVISION
September 17, 2025

No. 1-24-0913

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| *In re* ESTATE OF MARTIN J. LUNDGREN, Deceased, | ) |
| | ) |
| | ) Appeal from the |
| SHEN SHEN NI, Individually and as an Heir of Martin J. Lundgren, Deceased, | ) Circuit Court of |
| | ) Cook County |
| Petitioner-Appellant, | ) |
| | ) |
| v. | ) |
| | ) No. 19 P 7441 |
| MARK LUNDGREN, Individually, as an Heir of Martin J. Lundgren, as Executor of the Estate of Martin J. Lundgren, Deceased, and as Trustee of The Martin Lundgren Trust, dated November 8, 2018, CHICAGO TITLE LAND TRUST COMPANY, as Trustee of Land Trust No. 900749 and Land Trust No. 31004, MARTIN J. LUNDGREN, Individually and as an Heir of Martin J. Lundgren, and ERIC LUNDGREN, Individually and as an Heir of Martin J. Lundgren, | ) |
| | ) |
| | ) |
| | ) |
| | ) Honorable |
| | ) Kent A. Delgado, |
| | ) Judge Presiding. |
| | ) |
| | ) |
| Respondents-Appellees. | ) |

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Martin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirming the judgment of the circuit court of Cook County finding that the testator's son did not exert undue influence over the testator.

¶ 2    This appeal involves a dispute regarding estate planning documents executed by Martin Lundgren (Martin) approximately a year before his death at age 89. Martin's wife, Shen Shen Ni (Shen Shen), filed an action in the circuit court of Cook County alleging, in part, that Martin's son Mark Lundgren (Mark) had exercised undue influence over Martin. Shen Shen alleged that Mark coordinated with his attorney to coerce his ailing father into executing new will and trust documents—which were favorable to Mark—while Shen Shen was out of the country. Mark disputed these allegations, maintaining that the estate planning documents at issue reflected his father's wishes and were not the result of any undue influence. Following a bench trial, the circuit court found that Shen Shen had satisfied her burden to create a presumption of undue influence but ultimately found that Mark had rebutted the presumption. On appeal, Shen Shen contends that the trial court incorrectly concluded that Mark had not revoked the challenged trust. She also argues that the trial court's finding that Mark did not exercise undue influence over Martin was against the manifest weight of the evidence. As discussed below, we affirm.

¶ 3                              BACKGROUND

¶ 4                        *Martin and Shen Shen*

¶ 5    Martin met Shen Shen, who was originally from China, in 1989. Martin was approximately 25 years older than Shen Shen, and he had three children from a prior marriage: Martin Lundgren (Marty), Eric Lundgren (Eric), and Mark Lundgren (Mark). Martin owned two buildings: 1505 North Wells Street and 1509 North Wells Street in Chicago. Martin's family purchased 1509 North Wells in 1917, and his grandmother purchased 1505 North Wells during the Great Depression.

¶ 6    After accompanying Shen Shen on a trip to China in approximately 1990, Martin married one of Shen Shen's sisters. Shen Shen subsequently moved into an apartment in 1505 North

Wells, where Martin and Shen Shen's sister resided. According to Shen Shen, her sister did not enjoy living in Chicago, and she returned to China. Shen Shen continued to reside with Martin; she did not pay rent, but she cleaned the apartment and cooked.

¶ 7    Shen Shen opened a custom framing shop in 1509 North Wells, and Martin worked in the shop. After divorcing her sister, Martin married Shen Shen in 2005. Although Martin eventually moved into the garden apartment downstairs from Shen Shen's first-floor residence, the couple spent time together. Shen Shen represented that she was responsible for caring for Martin.

¶ 8                    *Martin's Estate Plan Prior to November 2018*

¶ 9    Martin owned 1505 North Wells through a land trust established in 1999. Throughout the years, he repeatedly amended the contingent beneficiaries. Pursuant to an amendment executed in 2016, Martin named Shen Shen as the 100% contingent beneficial interest holder as to the land trust for 1505 North Wells.

¶ 10    In February 2017, Martin executed a last will and testament. The will provided that Martin bequeathed $5000 each to his sons Eric and Marty. He left the remainder of his personal estate, including bank accounts, to Shen Shen. As to the land trust established for 1509 North Wells, Martin designated Shen Shen as the 55% contingent beneficial interest holder and Mark as the 45% contingent beneficial interest holder.

¶ 11                    *November 2018 Estate Plan and Subsequent Litigation*

¶ 12    As discussed further below, Mark arranged for attorney Sharon Buccino (Buccino) to meet with Martin while Shen Shen was visiting China in the fall of 2018. On November 8, 2018, Martin executed multiple documents prepared by Buccino.

¶ 13    The new will executed on November 8, 2018, which named Mark as the executor, made no provisions for Eric or Marty. Martin bequeathed his tangible personal property to Shen Shen.

¶ 14   A new trust document as to 1505 North Wells and 1509 North Wells named Martin and Mark as co-trustees. Any amendment to or revocation of the trust required the written consent of the co-trustee. The document generally provided that if Shen Shen survived Martin, she would receive 75% of the trust income and Mark would receive 25%. Shen Shen was given the right to use the first-floor apartment of 1505 North Wells and the first-floor commercial unit of 1509 North Wells rent-free during her lifetime. The trust agreement further provided, however, that if Shen Shen resided in the apartment or operated a business in the commercial space, the fair market rent would be deducted from her share of the trust income. Upon Shen Shen's remarriage, conjugal cohabitation, or death, any interest in the trust property would be held in a separate fund for Mark.

¶ 15   After Shen Shen returned from China and learned about the new documents, Buccino received a letter signed by Martin indicating that he decided to use another attorney and would not be needing her services. Attorney Leon Zelechowski (Zelechowski) and his partner, Matthew Douglas (Douglas), met with Martin and Shen Shen in their residence in December 2018. Martin signed a new estate plan approximately ten days later. When Zelechowski and Douglas submitted the December 2018 estate plans to the title company, the documents were rejected based on the absence of Mark's consent. Although Douglas sent a letter to Mark in January 2019 asking him to consent to the revocation of the trust, no written revocation was provided.

¶ 16   In April 2019, Shen Shen filed a petition in the circuit court of Cook County for guardianship of Martin's person and estate, and she was appointed as Martin's temporary guardian. While Shen Shen's petition and Mark's cross-petition for guardianship were pending, Martin passed away at the age of 89 on October 9, 2019.

¶ 17    Shen Shen and Mark each petitioned to be the independent executor of Martin's estate; Mark was appointed. Shen Shen subsequently filed a complaint for declaratory relief and a petition to contest the will. The complaint asserted various claims against Mark, including breach of fiduciary duty, undue influence, and financial exploitation. Shen Shen also alleged that Martin lacked capacity to understand and execute the estate planning documents on November 8, 2018. Eric and Marty filed a similar petition against Mark, which they subsequently dismissed.

¶ 18    Mark filed a counterclaim against Shen Shen for financial exploitation. He alleged that Shen Shen "had an abnormal influence" over Martin and often berated him. Mark alleged, on information and belief, that Shen Shen had acquired one or two condominium units at 1515 North Wells Street using Martin's income and assets, but she did not place Martin on the title. Mark further alleged, on information and belief, that Shen Shen used a power of attorney executed in December 2018 to (a) close a trading account solely owned by Martin, (b) then move approximately $200,000 from the trading account into a joint account, and (c) then transfer funds into her personal account in her name only.

¶ 19    Shen Shen filed a motion for partial summary judgment as to whether Mark was a fiduciary vis-à-vis Martin prior to and on November 8, 2018, when the challenged estate planning documents were executed. She argued that "[w]here such a confidential or fiduciary relationship is found to exist, there is a *presumption* that the transaction complained of resulted from undue influence." (Emphasis in original.) Mark responded that Martin had executed a power of attorney naming Mark as his agent regarding his property in March 2017 but noted that Martin had revoked it one month later. Mark also acknowledged that his father had named him as his healthcare power of attorney in 2016 but maintained that such designation did not impose

a fiduciary duty. Finally, Mark argued that the facts did not indicate a dominant-subservient relationship between him and his father.

¶ 20    The court granted the motion for partial summary judgment, finding that Mark was Martin's fiduciary at that time based on Martin's dependence on Mark. The matter proceeded to a bench trial, where the testimony included the following.

¶ 21                    *Testimony of Mark Lundgren*

¶ 22    During direct examination by Shen Shen's counsel, Mark testified that he was previously estranged from Martin based on an incident which occurred years earlier, *i.e.*, Mark called the police as he believed Martin took his Christmas ornaments and intended to sell them in the frame shop. Mark and Martin subsequently reestablished their relationship around 2012. Following their reconciliation, Mark visited his father frequently, as Mark's office was in the same area as Martin's residence. During those years, Mark represented that he handled various matters for Martin and Shen Shen, including building repairs and tax and financial issues. Mark also testified that he and his girlfriend, who shared a daughter, brought groceries to his father weekly. When asked about his father's dementia diagnosis in 2017, Mark testified: "[I]t was nothing they were concerned about. They said that his small vessels [*sic*], I remember it, they were small, that he might have dementia, but they weren't concerned about it at the time."

¶ 23    After Martin experienced more health issues in 2018, Mark testified that he and his father discussed "getting his affairs in order." When Mark and Martin attempted to contact Martin's prior attorney to obtain Martin's estate planning file, they learned that the attorney had retired. Mark then suggested that Martin meet with Sharon Buccino, an attorney who had assisted Mark with the succession plan for his business ten years earlier. In an email sent on October 29, 2018, Mark informed Buccino that Martin was willing to meet with her.

¶ 24    Mark testified that Martin executed a new estate plan prepared by Buccino on November 8, 2018.  As noted above, the estate plan provided that Mark and Martin would be co-trustees as to the buildings, *i.e.*, 1505 North Wells and 1509 North Wells.  As Martin was a "little old school," Mark told Buccino that if Martin tried to pay her a reduced rate, Mark would pay the difference so Buccino would receive her full rate.

¶ 25    Upon questioning by Shen Shen's counsel, Mark testified that he had first reached out to Buccino regarding multiple issues involving Martin, including a potential guardianship, in April 2018.  Mark asked Buccino about the validity of Martin's marriage to Shen Shen and about Shen Shen's removal of property from a joint account and placement in her name only.  Mark also expressed concerns regarding his father's care.  According to Mark, Shen Shen relayed "that she didn't want to take care of dad, dad had lived too long, she wanted to put him in a home and she wanted to sell the property."  In an email sent on August 28, 2018, Mark informed Buccino that Shen Shen would be in China from October 10 to November 15, 2018.  Mark wrote, "Let's make a game plan so when she leaves we are ready."  During his trial testimony, Mark denied "waiting for her to leave."

¶ 26    Mark testified that a report filed with the court in the 2019 guardianship proceedings indicated that Martin told the guardian *ad litem* (GAL) that he was "upset" with Mark regarding the November 2018 estate planning documents.  According to the GAL, Martin also "seemed upset" about a prior incident (the ornament incident) where Mark had "got him thrown in jail."

¶ 27    Mark acknowledged that no income was distributed from the trust to him or Shen Shen following Martin's death.  Mark testified that "[w]e don't have the money in the account" and that he had used between $25,000 and $30,000 of his own funds to perform work on the properties.

¶ 28    During cross-examination, Mark testified that he did not make any suggestions to Buccino regarding a possible estate plan or otherwise attempt to influence Buccino regarding her drafting of Martin's documents. Mark confirmed that his role was to "make the introduction to Ms. Buccino and provide any information she requested." As to Mark's partial payment of Buccino's fees, Mark also confirmed that it was not uncommon for him to "make up the difference in a bill just to keep the peace."

¶ 29                        *Testimony of Sharon Buccino*

¶ 30    Buccino testified that she had been licensed to practice law in Illinois for 36 years and that her practice focused on estate planning. She had provided legal services to Mark in 2006. Buccino acknowledged that she did not meet with Martin until October 31, 2018, but she had answered questions from Mark for several months prior to that meeting. Mark also forwarded to Buccino various voicemails left by Martin for Mark, including a voicemail wherein Martin expressed "some very large dissatisfaction with his life and with his wife." According to Buccino, "Mark had concerns about his father, his father had concerns about his estate plan, and Mark asked me for some help in trying to understand what was going on."

¶ 31    Mark had represented to Buccino that the properties—1505 North Wells and 1509 North Wells—had been in the family for a "very long time" and that Mark's grandmother told him that she wanted them to be kept in the family. According to Buccino, Martin subsequently expressed a similar sentiment when they discussed the properties. Buccino testified that she suggested that the properties could be held in trust for Shen Shen's benefit and then "revert" to Mark at her death, "keeping it in the family."

¶ 32    Buccino testified that she wanted to meet with Martin without Shen Shen. She explained, "I wanted to meet with Martin Lundgren alone, without anybody else, so that I would get

Martin's ideas about his estate plan, not his wife's, not his son's."

¶ 33    Buccino first met with Martin at his apartment on October 31, 2018.  Mark brought Buccino into the apartment and introduced her to Martin.  Martin was dressed in a white T-shirt and diapers and was seated in a wheelchair with a blanket covering his legs.  Martin asked Mark to stay, but Mark declined, stating "this is your business, dad.  You need to *** do with your money what you want to do with it, you need to remember it's your money."

¶ 34    After Mark left, Buccino and Martin discussed his family assets and estate plans. Buccino asked Martin about two condominiums at 1515 North Wells and informed him that they were titled in the name of the Shen Shen Ni Trust.  According to Buccino, Martin "kind of hung his head down and like shook his head side to side like he was disappointed to hear that, not what he expected; he seemed to think that they were owned jointly."  Buccino testified that Martin spoke fondly about Mark, and he "believed that Mark was the one looking out for him."

¶ 35    Buccino testified that she met with Martin a second time on November 2, 2018.  When she arrived at Martin's apartment, he referred to her as the "lady lawyer."  By that time, Buccino's colleague had obtained the land trust agreement using an authorization executed by Martin.  Buccino reviewed the documents and prepared a pie chart to illustrate to him how the property would be distributed upon his death.  Buccino advised Martin that he could "give Shen Shen the rent from the building without giving her the building."  According to Buccino, Martin's eyes lit up and "he was like, well, that's what I would like to do."  Buccino testified: "And so that's how the idea of putting it in the trust and letting it pass to Mark after Shen Shen's death came to light because he had never met with a real estate planning attorney, and he had no idea that such a concept existed."  Buccino's suggestion was a "revelation" to Martin, as he previously thought that "in order to give Shen Shen that much of the rent, he had to give her that

much of the building."

¶ 36    Buccino acknowledged that she did not inform Martin that she and Mark had been communicating for six months, but she testified that Martin was aware that they had been communicating "for some time" since she told Martin that Mark had provided some of the information she used to prepare an asset summary.

¶ 37    In an internal memorandum to the file on November 8, 2018, Buccino noted that Martin had expressed that he wanted some property to pass to Shen Shen's family members, as they had been helpful to him in the past.  Buccino wrote: "We discussed that Shen Shen would receive the joint property," *e.g.*, the cash in their joint accounts, and she also owned the units at 1515 North Wells to leave to her family.  [Martin] felt that was appropriate."  With respect to 1505 North Wells and 1509 North Wells, Buccino and Martin had discussed the idea of paying the rent to Shen Shen for her life, as well as the right to reside in one unit and to keep the frame shop. Martin indicated that he wanted Mark to receive some of the rent "because of all the work he does for him."  According to Buccino, Martin settled on a 75%-25% split of the income between Shen Shen and Mark.  When Buccino asked whether Shen Shen should continue to receive the payments if she remarried after his death, Martin responded that he "saw no reason to make her next husband rich."

¶ 38    Buccino also memorialized in the November 8, 2018, memorandum that Martin was "very clear that he wanted to relieve Shen Shen of any obligations with respect to the two buildings (indicated she was very stressed and did not understand everything involved) and that he wanted he and Mark to control them together."  Buccino thus prepared a revocable trust naming Martin and Mark as co-trustees.  Buccino further noted that both Martin and Mark had indicated that Shen Shen wanted to sell the buildings; Buccino opined that such sale would result

in an unnecessarily large capital gains tax. As she was concerned that Shen Shen—or Marty and Eric—might attempt to "overturn" Martin's wishes, Buccino included a provision that the trust could not be amended without Mark's written consent.

¶ 39    Shen Shen's counsel also questioned Buccino regarding the execution of the estate planning documents on November 8, 2018. When Buccino arrived at Martin's apartment with her assistant Agnes Ciochon, Mark was present. Peter Johnson (Johnson) (discussed further below) arrived later. Buccino met with Martin alone in the dining room and read the "non-boilerplate provisions" (*e.g.*, the 75%-25% income split) to Martin. She summarized some standard paragraphs and read the "important" provisions aloud. Martin initially objected to one of the documents—a power of attorney—as he was concerned that "the agent could steal everything." Buccino suggested that the power of attorney be revised to only become effective upon a doctor's certification that Martin was no longer able to handle his financial affairs. Martin agreed to the modification; Buccino handwrote the change, which Martin initialed. After execution of the documents, Buccino sent them to Mark, at Martin's request.

¶ 40    Buccino testified that she subsequently sent a letter to the title company with respect to the land trust, directing the company to address all future mailings to Mark. The letter also directed the company to verify with Mark "in the event you are presented with any documents purporting to assign or convey the beneficial interest in this land trust."

¶ 41    Buccino further testified that she received a letter dated November 28, 2018, which was signed by Martin, indicating that he decided to use another attorney and he would not need Buccino's services. A check for $1000 was enclosed to cover any expenses. Buccino believed that the letter was written by Shen Shen, not Martin, as the phrasing did not sound like Martin.

¶ 42    On December 26, 2018, Buccino sent an email to attorney Zelechowski regarding a

telephone conversation they had earlier that day. Buccino expressed surprise that Martin had gone to Zelechowski's office, as Zelechowski had represented. She wrote: "Presuming we are both interested in Mr. Lundgren's true intentions, I would appreciate a copy of the videotape of him signing the documents." In response to a subsequent email asking Mark to revoke the trust, Buccino called Zelechowski on December 31, 2018, and relayed that "I didn't think it was appropriate to revoke a fully funded revocable trust and that the appropriate thing to do would be to amend it."

¶ 43    On cross-examination, Buccino testified that she had "concerns" regarding how Martin was being treated, based on the information relayed by Mark. She described Martin's garden apartment as "very sparse," with a twin bed and "no feminine touches." Buccino noted other situations in her law practice where there was a large age gap between spouses and where there were stolen assets, abuse, or neglect. She also described the estate plan which she prepared for Martin to be a standard option in the case of a second marriage; Buccino noted that Martin's marriage to Shen Shen was his third or fourth marriage.

¶ 44                    *Testimony of Peter Johnson*

¶ 45    Peter Johnson (Johnson), a former air marshal who resides in Minnesota but travels frequently, testified that he was a witness to Martin's signing of the estate documents on November 8, 2018. Johnson conducted business with Mark commencing in approximately 2014 or 2015, and Johnson's business had a 14-month lease on an apartment near Martin's residence in 2017 and 2018. When Johnson and Mark had business meetings at a restaurant across the street from Martin's residence, Johnson frequently stopped by to visit Martin. Martin and Johnson were both military veterans, and they would discuss "[e]verything from stocks to sports, weather, the casual conversation, buildings, et cetera." Johnson also frequently walked by

12

Martin's garden apartment and observed Martin through the window as he worked on a crossword puzzle or watched television. Johnson considered Martin to be his friend.

¶ 46    Johnson testified that he never observed anything which would indicate that Martin had any mental impairments. He described Martin's relationship with Mark as a positive father-son relationship, and he never witnessed any attempt by Mark to control or intimidate Martin. Johnson testified, "Martin was a strong-headed personality. I mean that respectfully. But he doesn't get intimidated, at least in my experience."

¶ 47    Johnson testified that he did not initially realize that Shen Shen was Martin's wife when they met in 2016; he thought she was a tenant. After Shen Shen mentioned that she was approached by a party interested in purchasing the buildings, Johnson "stepped back from the conversation" so as to not be intrusive.

¶ 48    When Johnson went to Martin's apartment to witness the document signing on November 8, 2018, Martin greeted him with "Hi Pete from Minnesota." Johnson was not present for Martin's initial discussions with his attorney (Buccino), as he "didn't think it was appropriate for me to sit over and listen to the nuances of the will." Johnson witnessed, however, the exchange between Buccino and Martin (described above) regarding the modification of the power of attorney to address Martin's concerns. After all the documents were executed, Martin "thanked everybody for all their hard work to put the documents together," which indicated to Johnson that Martin approved of the estate plan.

¶ 49    Johnson noted that when he walked by Martin's apartment between November 8, 2018, and November 28, 2018, the blinds were no longer open. On November 29, 2018, Mark and Johnson stopped by Martin's apartment to bring him a hot dog. Johnson observed Shen Shen kneeling next to Martin; she then started screaming about the will and whispering in Martin's

ear. After briefly leaving the room, Shen Shen returned and "started screaming about lawyers and wills and buildings."

¶ 50                    *Testimony of Leon Zelechowski*

¶ 51    Zelechowski testified that he prepared estate planning documents for Martin which were executed in his law office on December 21, 2018. In a letter dated January 7, 2019, Zelechowski's colleague Matthew Douglas asked for Mark's consent to the revocation of the November 8, 2018 trust. Douglas included a draft revocation consent document with the letter. Zelechowski testified that his firm did not receive any response to Douglas's letter.

¶ 52                    *Testimony of Paul Franciszkowicz*

¶ 53    Paul Franciszkowicz (Franciszkowicz), an attorney with 30 years' experience who practiced probate law, testified he began representing Martin in March 2019. When Franciszkowicz first met with Martin, "it was to find out what his concerns were with respect to his estate plan." Another attorney and Shen Shen were also present for their initial meeting.

¶ 54    Franciszkowicz testified that he had concerns regarding the preparation of any estate plan for Martin, as he perceived that Martin may have had an "impairment." Franciszkowicz suggested that Martin meet with a physician to evaluate his competence and comprehension. Based on the results of that evaluation, Franciszkowicz did not draft further estate planning documents, and a guardianship proceeding for Martin was initiated.

¶ 55    Based on his representation of Martin in the guardianship proceedings, Franciszkowicz described Martin as having a "very dominant personality." Franciszkowicz did not personally witness any attempts by Shen Shen to influence Martin.

¶ 56                    *Testimony of Dr. Geoffrey Shaw*

¶ 57    Dr. Geoffrey Shaw (Dr. Shaw), a geriatric psychiatrist, was contacted by Franciszkowicz

to evaluate Martin. Prior to his evaluation of Martin on April 2, 2019, Dr. Shaw was aware that Martin had congestive heart failure with swollen legs and diabetes. During the evaluation, Dr. Shaw asked Martin multiple questions to evaluate his cognitive ability such as orientation, executive functioning, and memory recall. Based on the evaluation, Dr. Shaw opined that Martin had dementia, which he described as a "progressive degenerative condition." In light of the severity of his deficits, Dr. Shaw believed that Martin was incapable of managing his financial affairs but retained some decision-making capabilities regarding personal decisions. On cross-examination, Dr. Shaw testified that his opinions were based on his evaluation of Martin in April 2019; Dr. Shaw acknowledged that he possibly would have had a different opinion as to Martin's capacity if the evaluation was performed in 2018.

¶ 58                    *Trial Court's Ruling on Presumption and Mark's Evidence*

¶ 59    After Shen Shen's counsel rested, she argued that Shen Shen had presented a *prima facie* case of undue influence, which would shift the burden of production to Mark. The trial court agreed, finding that there was a rebuttable presumption of undue influence. Mark then presented testimony from multiple witnesses, some of whom had previously testified. Mark provided additional testimony regarding his relationship and communications with his father. Attorney Douglas testified regarding the execution of the estate planning documents in December 2018. According to Douglas, his firm was unaware of the existence of the November 2018 estate planning documents until certain executed documents prepared by his firm were rejected by the title company.

¶ 60    Buccino testified, in part, that when she went to Martin's apartment for the first time, she found it "a little bit unusual and disturbing" that Shen Shen did not live in the apartment. Buccino testified that Martin told her that he thought Shen Shen "had a bad heart," so he was

concerned about her ability to manage the buildings. According to Buccino, Martin wanted to manage the buildings with Mark. When Buccino met with Martin, he showed her photographs of the buildings from the early 1900s and talked about the family history of the buildings.

¶ 61    Buccino opined that there was no undue influence exerted by Mark as she and Mark never conversed regarding the estate plan, Mark was not present at her meetings with Martin, and Mark reminded Martin to "remember, it's your money" and "[y]ou do what you want with it." When asked whether she observed Mark exert any type of dominance over his father, Buccino responded, "No. Deference."

¶ 62                                    *Testimony of Adriana Suarez*

¶ 63    Adriana Suarez (Suarez), a friend of Martin for more than 40 years, testified that she was previously employed as a nursing home administrator. He visited Suarez at her home in Florida, and she visited him in Chicago. Shen Shen never accompanied Martin to visit Suarez in Florida. Suarez traveled to Chicago to visit Martin in September 2018, as she knew his health was declining and wanted to spend time with him. She testified that he "appeared to be in all his faculties." Suarez saw Mark when he stopped by Martin's residence each day; she described Mark and Martin's relationship as "very positive." Suarez also observed Shen Shen a few times during that visit. Suarez expressed concern regarding the "erratic" way Shen Shen prepared Martin's medication dosages.

¶ 64    Suarez testified that she visited Martin again in November 2018, and that he was "alert" and "oriented," although he could not walk. She noticed that the blinds on Martin's windows were closed, even though they had previously been open. When Suarez brought Martin take-out cuisine from a nearby restaurant when he was hungry, Shen Shen was upset and stated, "you know, if he eats everything, then I have to clean all his s***."

¶ 65                    *Testimony of Agnes Ciochon*

¶ 66    Agnes Ciochon, an estate planning secretary at Buccino's law firm, testified that she

notarized and witnessed the estate planning documents at issue.  Ciochon testified that she had a

mental checklist for red flags when she witnessed a will or a trust, *e.g.*, a testator's slurred

speech, sleepiness, or inability to answer questions without help, or the presence of a caretaker

"hovering around them."  She testified that she had no concerns regarding Martin; he conversed

with everyone, made jokes, seemed comfortable, and answered questions correctly.

¶ 67                    *Testimony of Shen Shen Ni*

¶ 68    Shen Shen testified that it was Martin's idea for him to move to the garden apartment.

According to Shen Shen, he could initially climb the stairs between the two apartments even

though he usually sat in a wheelchair.  By 2018, however, Martin was unable to climb the stairs.

¶ 69    Shen Shen testified that she cooked for Martin and otherwise took care of him, although

she worked long hours in the frame shop.  Shen Shen acknowledged that Mark helped maintain

the buildings and assisted with Martin's medical needs.  When Shen Shen wanted to visit China

in October 2018, Martin and Mark encouraged her to do so.  Shen Shen was worried, but Mark

promised to take care of his father.

¶ 70    She described Martin as a "very strong personality."  During an earlier deposition, Shen

Shen testified that "nobody control[led]" Martin.

¶ 71                    *Trial Court's Ruling*

¶ 72    After detailing the testimony and other evidence, the trial court denied Shen Shen's

request to set aside the trust based on a lack of capacity or a breach of fiduciary duty.  Shen Shen

withdrew her claim of financial exploitation.

¶ 73    As to the undue influence count, the trial court concluded that the presumption of undue

influence had been rebutted. The trial court found that Johnson's testimony reflected that Martin was "calling the shots" and that Shen Shen's testimony indicated that "he's his own man of his own mind." Although the trial court observed that Mark's "biases" may have initially influenced Buccino, the court found that she ultimately acted appropriately and created an estate plan which aligned with Martin's wishes. The trial court also noted that the estate plan was not "lopsided," as Shen Shen received rent and the liquid assets. The circuit court thus denied Shen Shen's request to set aside the estate documents based on undue influence.

¶ 74    The trial court also denied Shen Shen's request for a declaratory judgment as to the purported revocation of the trust, finding that there was no question that Mark "was refusing to sign" the proposed revocation agreement. Mark dismissed his counterclaim, and Shen Shen filed this timely appeal.

¶ 75                                    ANALYSIS

¶ 76    Shen Shen advances two primary contentions on appeal. She initially argues that the trial court erred, as a matter of law, in ruling against her on her declaratory judgment claim regarding the purported revocation of the November 2018 trust. Shen Shen also asserts that the trial court's finding that Mark did not exert undue influence is against the manifest weight of the evidence. We address each argument in turn.

¶ 77                            *Revocation of the Trust*

¶ 78    The trial court determined that Shen Shen did not prove her declaratory judgment claim, *i.e.*, that Mark's failure to timely object to Martin's trust amendment executed in December 2018 and the written revocation of the November 8, 2018, trust agreement constituted his approval. Shen Shen argues that a *de novo* standard of review applies, as legal determinations in declaratory judgment actions are reviewed *de novo*. *Oak Run Property Owners Ass'n v. Basta*,

18

2019 IL App (3d) 180687, ¶ 50. Mark maintains that a deferential standard of review applies to the trial court's determination, as the question turned on a factual dispute, *i.e.*, whether the evidence supported a finding that Mark was refusing to sign a revocation document. See *Pekin Insurance Co. v. Hallmark Homes, L.L.C.*, 392 Ill. App. 3d 589, 593 (2009). We need not resolve this discrepancy, as the result is the same under either standard.

¶ 79    Section 15 of the trust agreement dated November 8, 2018, provided, in pertinent part, as follows:

> "15. Multiple Trustees. During any period in which two co-trustees are acting hereunder, the following provisions shall be applicable where the context admits:
>
> * * *
>
> (c) Approval or Disapproval of Actions of Co-Trustee. An individual trustee shall be presumed to have approved any proposed act or proposed decision to refrain from acting made by the other trustee if the former fails to indicate approval or disapproval thereof within fifteen days of having received a written proposal to do so from the other trustee. ***"

The evidence presented at trial plainly indicated that Mark had refused and would continue to refuse to revoke the November 2018 trust documents. Upon her return from China, Shen Shen called Buccino to express concern regarding the documents and then engaged Zelechowski's firm to create new estate plans. Buccino subsequently contacted Zelechowski's firm and relayed that revocation of the November 2018 documents would be inappropriate. During the trial, Shen Shen's counsel seemingly recognized that Mark had not agreed to the revocation; counsel asked Buccino, "Do you know why Mark Lundgren decided not to accept the revocation?" Buccino responded, "I assume he wanted to keep the trust that was in place because he believed that's

what his father really wanted."

¶ 80    We also note that section 22 of the trust agreement dated November 8, 2018, provided: "I reserve the right at any time or from time to time, with the written consent of the trustee other than me, to amend or revoke this instrument and the trusts hereby evidenced, in whole or in part, by written instrument (other than a will or codicil) signed by me and delivered to the trustee." As Mark accurately observes, it is undisputed that he never gave any written consent to revoke, terminate, or amend the November 2018 estate planning documents.

¶ 81    We further observe that Matthew Douglas, Zelechowski's colleague, sent a letter dated January 7, 2019, to Mark, requesting that he execute the enclosed "Consent by Co-Trustee to Revoke Trust." The letter concluded, "Please note that failure to respond to this letter within the time specified above," *i.e.*, five business days from January 7, 2019, "will been deemed a refusal to consent to revocation and that further action may be taken to terminate the Trust." In accordance with Douglas's letter, any purported "failure to respond" would be considered a refusal to consent to the revocation.

¶ 82    Based on the foregoing, we conclude that the trial court did not err in its determination that Mark did not revoke the November 2018 trust documents.

¶ 83                                   *Undue Influence Finding*

¶ 84    Shen Shen also contends that the trial court's finding that Mark did not exert undue influence is against the manifest weight of the evidence. In the context of estate planning and probate law, "undue influence" refers to improper coercion or persuasion which overpowers the free will of a testator, causing him to execute an instrument which reflects the desires of another individual rather than his own. *Kuster v. Schaumburg*, 276 Ill. App. 3d 220, 224 (1995). See also *In re Estate of Baumgarten*, 2012 IL App (1st) 112155, ¶ 13 (describing undue influence as

"influence that is excessive, improper, or illegal"). The undue influence "must be directly connected with the execution of the instrument, operate at the time it was made, and be directed toward procuring the will in favor of a particular party or parties." *In re Estate of Elias*, 408 Ill. App. 3d 301, 319 (2011). "What constitutes undue influence cannot be defined by fixed words and will depend on the circumstances of each case." *In re Estate of Hoover*, 155 Ill. 2d 402, 411 (1993).

¶ 85 As the trial court's determinations regarding Shen Shen's undue influence claims were made in a bench trial, we must determine whether the findings were against the manifest weight of the evidence. See *In re Estate of Burren*, 2013 IL App (1st) 120996, ¶ 20. See also *Andrew W. Levenfeld & Associates, Ltd. v. O'Brien*, 2024 IL 129599, ¶ 56. "A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the judgment is arbitrary, unreasonable, or not based on the evidence." *In re Estate of Coffman*, 2023 IL 128867, ¶ 56.

¶ 86 Illinois law recognizes certain circumstances under which a rebuttable presumption of undue influence may arise. One such circumstance is where "(1) a fiduciary relationship exists between the testator and a person who receives a substantial benefit from the will, (2) the testator is the dependent and the beneficiary is the dominant party, (3) the testator reposes trust and confidence in the beneficiary, and (4) the will is prepared by or its preparation procured by such beneficiary." *DeHart v. DeHart*, 2013 IL 114137, ¶ 30. While proof of these elements "standing alone and undisputed by other proof" entitles the individual contesting the estate planning documents to a judgment, the presumption can be rebutted by contrary evidence. *Coffman*, 2023 IL 128867, ¶ 47.

¶ 87 The trial court found that the evidence established the foregoing elements. Mark

maintains, however, that Shen Shen failed to prove the fourth element, *i.e.*, that Mark prepared or procured the preparation of the estate planning documents. *Id.* ¶ 74 (noting that the "fourth element of the fiduciary-relationship presumption requires proof that the will was prepared by or its preparation was procured by the person who received a substantial benefit from the will"). Simply put, we are hard-pressed to accept Mark's contention. Mark communicated extensively with Buccino in the months preceding his father's execution of the estate planning documents in November 2018. According to Buccino, the concept of keeping the buildings (1505 North Wells and 1509 North Wells) "in the family" was initiated by Mark. Mark also provided financial documents to Buccino which she used in preparing materials for Martin. Regardless of his stated reason, Mark paid a portion of Buccino's attorney fees.

¶ 88    We agree, however, with the trial court's conclusion that Mark presented sufficient evidence to overcome the presumption of undue influence. "To overcome a presumption of undue influence in a will contest, a fiduciary who benefits from a will must present clear and convincing evidence that in the will, the testator freely expressed his own wishes and not the wishes of the fiduciary." *Burren*, 2013 IL App (1st) 120996, ¶ 23 (citing *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 463-65 (1983)). See also *In re Estate of Gerulis,* 2020 IL App (3d) 180734, ¶ 57 (observing that while the burden of production shifts to the respondent, the burden of persuasion remains with the petitioner). "When we review the trial court's conclusion that the presumption of undue influence has been rebutted, we defer to its findings of fact and reverse only if its conclusion is against the manifest weight of the evidence." *In re Estate of Mundorff*, 2024 IL App (4th) 230358-U, ¶ 35.

¶ 89    In this case, the circuit court found Buccino's testimony regarding her interactions with Martin to be credible. *Coffman*, 2023 IL 128867, ¶ 53 (observing that "[i]n its role as the finder

of fact, the court weighs all the evidence, determines the credibility of the witnesses, and draws reasonable inferences therefrom"). Among other things, Martin told Buccino during one of their meetings that Shen Shen wanted to sell 1505 North Wells and 1509 North Wells, but he was "against it." Furthermore, all parties who were present at the execution of the documents on November 8, 2018—including Peter Johnson and Agnes Ciochon—testified that Martin was coherent and clear. Johnson testified that the fact that Martin expressed concerns regarding the power of attorney demonstrated that "he was reading and debating" the document. Johnson further opined that Martin "was in a positive state" after executing the documents, as he thanked everyone for their efforts. Ciochon testified that she would have "walk[ed] out" if she felt discomfort regarding Martin's state, as she had done on prior occasions involving other testators.

¶ 90    Perhaps most significantly, multiple witnesses described Martin's strong personality and his unwillingness to be swayed by others. As the trial court observed, even Shen Shen's testimony indicated that "nobody tells [Martin] what to do." In sum, the trial evidence did not indicate that "improper coercion or persuasion" overpowered Martin's free will. See *Kuster*, 276 Ill. App. 3d at 224.

¶ 91    Based on the foregoing, we conclude that the trial court's ruling that Mark successfully rebutted the presumption of undue influence was not against the manifest weight of the evidence.

¶ 92                                    CONCLUSION

¶ 93    The judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 94    Affirmed.